UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
In re:

LIBOR-Based Financial Instruments      **MEMORANDUM AND ORDER**
Antitrust Litigation.

                              11 MDL 2262 (NRB)
This Document Applies to:

CASES LISTED IN APPENDIX

----------------------------------------X

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


# LIBOR VIII

## Table of Contents

I. Introduction ............................................. 3

II. Background .............................................. 3

III. Plaintiffs' Motions for Leave to Amend .................. 12

   1. General Legal Standard for Leave to Amend.............. 13

   2. Amendments Related to Personal Jurisdiction............ 15

      2.1. Counterparty Claims............................... 15

      2.2. Indirect Counterparty Claims...................... 21

      2.3. Non-Counterparty Claims and Conspiracy Jurisdiction. 26

      2.4. "Overt Acts" in Furtherance of the Conspiracy....... 35

   3. Other Amendments...................................... 43

      3.1. Lender Plaintiffs' Proposed Amendments............. 43

      3.2. NCUA's Proposed Amendments......................... 45

      3.3. FFP Plaintiffs' Proposed Amendments................ 45

IV. Defendants' Motion to Dismiss Against Schwab and Doral ... 50

   1. General Legal Standard for Motion to Dismiss........... 50

   2. Motion to Dismiss Schwab's Claims Based on Lack of
      Personal Jurisdiction................................. 52

    2.1. Nationwide General Jurisdiction Based on the Exchange Act's Nationwide Service of Process................. 55

    2.2. Specific Jurisdiction over Defendants in Exchange Act Claims............................................. 59

    2.3. Pendent Jurisdiction over State Law Claims......... 64

  3. Motion to Dismiss Schwab's Claims Based for Failure to State a Claim......................................... 67

    3.1. Addition of New Defendants and Claims.............. 67

    3.2. Exchange Act § 10(b) Claims........................ 70

    3.3. Exchange Act § 20(a) Claims........................ 73

    3.4. Unjust Enrichment Claims........................... 76

    3.5. Tortious Interference Claims....................... 79

  4. Motion to Dismiss Doral's Claims for Lack of Personal Jurisdiction.......................................... 82

  5. Motion to Dismiss Doral's Claims for Failure to State a Claim.................................................. 84

    5.1. Fraud, Tortious Interference, and Negligent Misrepresentation Claims........................... 84

    5.2. Donnelly Act Claim................................. 88

    5.3. Sherman Act Claims................................. 90

V. Defendants' Motion for Judgment on the Pleadings.......... 91

  1. General Legal Standard for Judgment on Pleadings........ 93

  2. Instruments Issued by Panel Bank Defendants' Subsidiaries/Affiliates................................. 94

  3. Instruments Issued by Panel Banks but Sold by Their Related or Unrelated Subsidiaries/Affiliates............ 99

VI. Conclusion............................................. 104

## I. Introduction

This Memorandum and Order, our eighth extensive opinion in this consolidated multi-district litigation ("MDL"), addresses eight different motions post-dating the Second Circuit's decision in <u>Charles Schwab Corp. v. Bank of America Corp.</u>, 883 F.3d 68 (2d Cir. 2018) ("<u>Schwab</u>"), in which the Circuit reviewed <u>de novo</u> this Court's decision to dismiss all claims brought by Charles Schwab Corporation and its related entities ("Schwab"), <u>see</u> <u>In re LIBOR-Based Fin. Instruments Antitrust Litig.</u>, 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) ("<u>LIBOR IV</u>"). Since many of the motions have been brought in response to <u>Schwab</u>, we summarize the relevant rulings in the decision before addressing each motion on its merits.

## II. Background

The nature of LIBOR, its alleged manipulation, and the parties in this case have been explored in our prior opinions.[1] Thus, we assume familiarity with the facts. Likewise, the unique procedural journey of Schwab's action[2] needs not be repeated here as it was

---

[1] <u>In re LIBOR-Based Fin. Instruments Antitrust Litig.</u>, 299 F. Supp. 3d 430 (S.D.N.Y. 2018) ("<u>LIBOR VII</u>"); <u>In re LIBOR-Based Fin. Instruments Antitrust Litig.</u>, 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) ("<u>LIBOR VI</u>"); <u>In re LIBOR-Based Fin. Instruments Antitrust Litig.</u>, 2015 WL 6696407 (S.D.N.Y. Nov. 3, 2015) ("<u>LIBOR V</u>"); <u>LIBOR IV</u>, 2015 WL 6243526, <u>aff'd in part, vacated and remanded in part sub nom.</u> <u>Schwab</u>, 883 F.3d 68; <u>In re LIBOR-Based Fin. Instruments Antitrust Litig.</u>, 27 F. Supp. 3d 447 (S.D.N.Y. 2014) ("<u>LIBOR III</u>"); <u>In re LIBOR-Based Fin. Instruments Antitrust Litig.</u>, 962 F. Supp. 2d 606 (S.D.N.Y. 2013) ("<u>LIBOR II</u>"); <u>In re LIBOR-Based Fin. Instruments Antitrust Litig.</u>, 935 F. Supp. 2d 666 (S.D.N.Y. 2013) ("<u>LIBOR I</u>"), <u>vacated and remanded sub nom.</u> <u>Gelboim v. Bank of Am. Corp.</u>, 823 F.3d 759 (2d Cir. 2016) ("<u>Gelboim</u>").

[2] The action under consideration in this opinion is <u>Charles Schwab Corp., et al. v. Bank of America Corp., et al.</u>, 13-cv-7005 (NRB). Schwab brought three

discussed at great length in LIBOR IV, see 2015 WL 6243526, at *10, *18, and in Schwab, see 883 F.3d at 80-81.

In LIBOR IV, we dismissed Schwab's complaint in its entirety.[3] On appeal, Schwab argued that we erred in dismissing: (1) its state law claims for lack of personal jurisdiction, see LIBOR IV, 2015 WL 6243526, at *19-38; (2) its fraud claims relating to fixed-rate instruments for failure to state a claim, see id. at *65; (3) its Exchange Act claims for failure to state a claim, see id. at *70; and (4) some of its unjust enrichment claims as untimely, see id. at *127-28, *177. See Schwab, 883 F.3d at 81.

In reviewing our decision to dismiss Schwab's state law claims for lack of personal jurisdiction, the Circuit made rulings that are applicable to three categories of defendants: (1) defendants who "allegedly solicited and sold debt instruments directly to

---

other actions that have been consolidated into this MDL: Schwab Short-Term Bond Market Fund, et al. v. Bank of America Corp., et al., 11-cv-6409 (NRB); Charles Schwab Bank, et al. v. Bank of America Corp., et al., 11-cv-6411 (NRB); Schwab Money Market Fund, et al. v. Bank of America Corp., et al., 11-cv-6412 (NRB). The main difference between the instant action and the other three actions is the type of federal claims Schwab asserts against defendants. In the instant action, Schwab asserts claims under the Securities Exchange Act of 1934. In the other three actions, Schwab asserts claims under the Sherman Act and the Racketeer Influenced and Corrupt Organization Act (RICO), which we dismissed in LIBOR I. Schwab appealed only our dismissal of its Sherman Act claims, and the Second Circuit reversed that dismissal in Gelboim. On remand, we dismissed Schwab's antitrust claims on personal jurisdiction grounds. See LIBOR VI, 2016 WL 7378980, at *25. LIBOR VI is currently on appeal. See In re LIBOR-Based Fin. Instruments Antitrust Litig., No. 17-1569 (2d Cir. filed May 12, 2017).

[3] In its complaint, Schwab asserted federal securities claims based on defendants' alleged violations of the Securities Exchange Act of 1934 and SEC Rule 10b-5 and various state law claims, including: fraud (and aiding and abetting fraud); unfair business practices; interference with prospective economic advantage; breach of the implied covenant of good faith and fair dealing; violations of California's blue sky law; rescission of contract; and unjust enrichment.

Schwab in California" ("Counterparty defendants"), Schwab, 883 F.3d at 79; (2) defendants who "allegedly sold debt instruments indirectly to Schwab through 'broker-dealer subsidiaries or affiliates'" ("Indirect Counterparty defendants"), id.; and (3) defendants who did not transact with Schwab but "allegedly conspired with the other Defendants to manipulate LIBOR to Schwab's detriment" ("Non-Counterparty defendants"), id.

As to Counterparty defendants, the Circuit found that "[t]he solicitation of and sale of financial instruments to Schwab in California" were sufficient to establish personal jurisdiction.[4] Id. at 83. However, the Circuit continued, "sales in California do not alone create personal jurisdiction for claims premised solely on Defendants' false LIBOR submissions in London" because Schwab "must establish the court's jurisdiction with respect to each claim asserted." Id. (quoting Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 24 (2d Cir. 2004)). In addition, the Second Circuit held that Schwab's allegations were "insufficiently

---

[4] In making this ruling, the Second Circuit considered declarations of several Schwab employees, see Goldman Decl., ECF No. 1512; Hastings Decl., ECF No. 1513; Klingman Decl., ECF No. 1514, that had not been previously filed and, therefore, played no part in LIBOR IV. The declarations alleged that some defendants solicited business from Schwab via telephone calls, emails, Bloomberg messages, and other forms of solicitation in California. See Hastings Decl. ¶4, Klingman Decl. ¶4. No such allegation was even mentioned in Schwab's amended complaint (ECF No. 672) that we reviewed in LIBOR IV. Had Schwab submitted those affidavits to this Court, our ruling would have been different at least as to Counterparty defendants. See In re LIBOR-Based Fin. Inst. Antitrust Litig., 2016 WL 1301175, at *4 (S.D.N.Y. Mar. 31, 2016), ECF No. 1357 ("March 31, 2016 Order") (finding that defendants' solicitation and sale of mortgage loans to Freddie Mac supported the exercise of personal jurisdiction).

individualized to make out a prima facie case of personal jurisdiction over" Citibank, HSBC, and JPMorgan Chase because "each of those 'Defendants' is actually two distinct Defendants – a parent and a wholly owned subsidiary"; Schwab must put forth sufficiently individualized allegations against each defendant so that this Court could determine whether defendant "sold directly to Schwab and, if not, whether [defendant] should be considered an indirect seller or non-seller (or whether it belongs in this lawsuit at all)." Id. at 84.

As to Indirect Counterparty defendants, the Circuit found Schwab's allegations of agency relationship insufficient. In order to establish specific jurisdiction over a defendant based on its affiliate's or subsidiary's activities in California, Schwab must plausibly allege that the subsidiary or affiliate acted as the defendant's agent in California "for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." Id. at 85 (quoting Grove Press, Inc. v. Angleton, 649 F.2d 121, 122 (2d Cir. 1981)).

As to Non-Counterparty defendants, the Circuit adopted the three-factor test for alleging a conspiracy theory of jurisdiction set forth in Unspam Technologies, Inc. v. Chernuk, 716 F.3d 322, 328 (4th Cir. 2013). Schwab must allege that: "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had

sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." Schwab, 883 F.3d at 87. In alleging conspiracy jurisdiction, Schwab could not rely on a defendant's sale of LIBOR-based instruments as an overt act in furtherance of the pled conspiracy because "the conspiracy to manipulate LIBOR had nothing to do with the California transactions, and there is thus no reason to impute the California contacts to the co-conspirators." Id. Finally, the court rejected Schwab's assertion that personal jurisdiction could be established over all defendants based on "the obvious and direct effects of [defendants' manipulation of LIBOR] in California." Id. Mere foreseeability that the effects of LIBOR manipulation would "reach an economy as large as California's does not mean that Defendants' conduct in London was 'expressly aimed' at that state." Id. at 88.

Turning to our dismissal of Schwab's fraud and Exchange Act claims concerning fixed-rate notes, the Second Circuit affirmed our decision because fixed-rate notes "do not reference LIBOR at all." Id. at 91. Since Schwab did not plausibly allege that defendants made false LIBOR submissions "[to] induc[e] purchases of fixed-rate instruments," id. at 92, or "in connection with Schwab's purchase of fixed-rate instruments," id. at 96, Schwab could not assert state law or securities fraud claims concerning fixed-rate notes. The Circuit noted: "When Schwab purchased fixed-rate instruments, it received exactly what it expected." Id.

The Circuit, however, reversed our decision to dismiss Schwab's Exchange Act claims concerning floating-rate notes. In LIBOR IV, we found that Schwab's claims failed at the causation stage because, if LIBOR was "persistently suppressed when Schwab bought LIBOR-based bonds, then the bond's expected future interest payments would also have been suppressed." 2015 WL 6243526, at *70. Thus, since a bond's price is "equal to the present value of its expected future interest and principal payments, the bond's purchase price would also necessarily have been suppressed, so that Schwab may reap a windfall now that suppression has ended." Id. The Circuit disagreed, finding that "[a]lthough a depressed LIBOR that caused expectations of future interest payments to decrease might result in lock-step reductions in the price of floating-rate instruments," such an effect was not certain and could not be assumed at the pleading stage. Schwab, 883 F.3d at 93. Nonetheless, finding that Schwab's allegations of loss causation were unclear, the court instructed Schwab to "add allegations clarifying the loss causation theory or theories on which it relies." Id.

Schwab also reversed our partial dismissal of Schwab's unjust enrichment claims. In LIBOR IV, we found that, under California law, the statute of limitations on fraud claims "begins when 'a plaintiff suspects or should suspect that her injury was caused by wrongdoing.'" 2015 WL 6243526, at *127 (quoting Jolly v. Eli Lilly

& Co., 44 Cal. 3d 1103, 1110 (1988)). Since it was unclear when Schwab "became aware of the news articles that would have put them on inquiry notice," we did not dismiss any tort claims as untimely. Id. at *177. However, we held that Schwab's unjust enrichment claims were partially time-barred because an unjust enrichment claim was subject to a more limited discovery rule under which "the clock starts when the breach is no longer 'difficult . . . to detect.'" Id. at *128 (quoting April Enters., Inc. v. KTTV, 195 Cal. Rptr. 421, 436 (Ct. App. 1983)). The Second Circuit found that we had erred in applying the more limited discovery rule to Schwab's unjust enrichment claims. Since the claims "sound[ed] in fraud," they were subject to the inquiry notice rule as set forth in Jolly. 883 F.3d at 97. Accordingly, "partial dismissal of the unjust enrichment claims was unwarranted." Id.

Although the Circuit considered only Schwab's action, the Schwab decision has broader implications for all actions in this MDL because the decision affirmed several key jurisdictional rulings that we repeatedly made in our prior opinions. First, defendants' sales-related activities in plaintiffs' forum states cannot establish specific jurisdiction over claims premised on defendants' "daily LIBOR submissions to the BBA in London" because "activities in London do not constitute [in-forum] contacts." Schwab, 883 F.3d at 84; see also LIBOR IV, 2015 WL 6243526, at *30 ("[T]hat a panel bank defendant engaged in LIBOR 'marketing'

9

activities which reached a given forum state does not mean that the same defendant is subject to personal jurisdiction in that state on the basis of the defendant's manipulation of LIBOR."). Second, "the conspiracy to manipulate LIBOR had nothing to do with" defendants' transactions with plaintiffs, because the sale of LIBOR-based instruments motivated by defendants' "financial self-interest" could not have furthered their conspiracy to manipulate LIBOR. Schwab, 883 F.3d at 87; see also LIBOR VI, 2016 WL 7378980, at *9 ("[D]efendants' sales and trades of LIBOR-based products to plaintiffs in the United States are not within the scope of the reputation-motivated antitrust conspiracy."). Third, mere foreseeability that the effects of LIBOR manipulation could be felt in plaintiffs' forum states "does not mean that Defendants' conduct in London was 'expressly aimed' at that state." Schwab, 883 F.3d at 87; see also LIBOR IV, 2015 WL 6243526, *20 ("[W]hile the effect of LIBOR manipulation in the states in which plaintiffs sued was foreseeable, mere foreseeability does not confer personal jurisdiction."). In sum, the Circuit did not disturb our general ruling that, unless plaintiffs can plausibly allege that "a defendant determined, or transmitted, a false LIBOR submission" from the United States, id. at *32, we would exercise personal jurisdiction only over Counterparty defendants for plaintiffs' claims that are premised on their transactions with defendants or their purchases of instruments issued by defendants.

Finding that Schwab's deficient pleading of jurisdictional allegations was not insurmountable, the Second Circuit granted Schwab leave to amend so that it could "clarify the status of the grouped entities . . . and add allegations in support of its agency and conspiracy theories of jurisdiction." Id. at 90. After the Circuit's remand, we afforded other plaintiffs the same opportunity by instructing plaintiffs who wished to move for leave to amend to "demonstrate why leave to amend [was] warranted." See Apr. 11, 2018 Order, ECF No. 2490. However, we warned moving plaintiffs that "the scope of any amendment shall be limited to those prompted by the Second Circuit's decision in Schwab." Id.

In Part III of this opinion, we consider the motions for leave to amend filed by six different plaintiffs: (1) the Federal Home Loan Mortgage Corporation ("Freddie Mac"), see ECF No. 2563; (2) the Federal Deposit Insurance Corporation ("FDIC")[5] in its capacity as receiver for 38 closed banks, see ECF No. 2562; (3) Principal Financial Group and its affiliated entities ("Principal Financial"), see ECF No. 2546; (4) Principal Funds and its affiliated funds ("Principal Funds"), see ECF No. 2551; (5) plaintiffs in the lending institutions class action ("Lender

_____

[5] The FDIC seeks to incorporate the complaint filed on behalf of Doral Bank ("Doral") in 18-cv-1540 (NRB) into the complaint filed on behalf of 38 closed banks in 14-cv-1757 (NRB). Defendants do not oppose this request. See FDIC Mem. of Law in Supp. of Mot. for Leave to Amend, at 1, ECF No. 2568. Therefore, Doral's claims that survive the motion to dismiss will be consolidated into the main complaint. To avoid confusion between the two actions, we refer to the FDIC's complaint filed on behalf of Doral as Doral's complaint in this opinion.

plaintiffs"), see ECF No. 2552; and (6) the National Credit Union Administration Board[6] ("NCUA"), see ECF No. 2544.[7]

In Part IV, we consider defendants' motion for partial dismissal of Schwab's second amended complaint[8] and Doral's complaint[9] for lack of personal jurisdiction and venue and for failure to state a claim. See ECF No. 2622. In Part V, we consider defendants' motion for judgment on the pleadings to dismiss in the Over-the-Counter (OTC) class action plaintiffs' antitrust claims based on transactions with Panel Banks' subsidiaries or affiliates. See ECF No. 2620.

## III. Plaintiffs' Motions for Leave to Amend

In allowing plaintiffs to move for leave to amend, we limited the scope of proposed amendments "to those prompted by the Second Circuit's decision in Schwab." Apr. 11, 2018 Order. We also

---

[6] The NCUA brought its action as liquidating agent of U.S. Central Federal Credit Union ("U.S. Central"), Western Corporate Federal Credit Union, Members United Corporate Federal Credit Union, Southwest Corporate Federal Credit Union, and Constitution Corporate Federal Credit Union.

[7] In this opinion, we refer to Freddie Mac, FDIC, Principal Financial, and Principal Funds collectively as "FFP plaintiffs." We also refer to Principal Financial and Principal Funds as "Principal." Per our April 11, 2018 Order, each moving plaintiff submitted its proposed amended complaint: (1) Freddie Mac Proposed Third Amended Compl. ("Freddie Mac PTAC"), ECF No. 2567-1; (2) FDIC Proposed Second Amended Compl. ("FDIC PSAC"), ECF No. 2568-1-2; (3) Principal Financial Proposed Second Amended Compl. ("Principal Financial PSAC"), ECF No. 2547-1; (4) Principal Funds Proposed Second Amended Compl. ("Principal Funds PSAC"), ECF No. 2554-1; (5) Lender Plaintiffs Proposed Third Amended Consolidated Class Action Compl. ("Lender Pls. PTAC"), ECF No. 2572-1; and (6) NCUA Proposed Second Amended Compl. ("NCUA PSAC"), ECF No. 2545-1.

[8] After the Circuit's remand, Schwab filed their second amended complaint as of right. See Schwab Second Am. Compl. ("Schwab SAC"), ECF No. 2578.

[9] Doral's complaint was filed on February 20, 2018. See Compl., ECF No. 1, 18-cv-1540 (NRB).

cautioned plaintiffs that <u>Schwab</u> "offer[ed] no occasion to add or alter unrelated allegations that a plaintiff wishes had been better pleaded in the first instance." <u>Id.</u>

### 1. General Legal Standard for Leave to Amend

Rule 15 of the Federal Rules of Civil Procedure directs a court to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, motions for leave to amend "should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." <u>Burch v. Pioneer Credit Recovery, Inc.</u>, 551 F.3d 122, 126 (2d Cir. 2008) (per curiam).

A proposed amendment is futile if "the proposed new pleading fails to state a claim on which relief can be granted." <u>Krys v. Pigott</u>, 749 F.3d 117, 134 (2d Cir. 2014). "The adequacy of a proposed amended complaint to state a claim is to be judged by the same standards as those governing the adequacy of a filed pleading." <u>Anderson News, L.L.C. v. Am. Media, Inc.</u>, 680 F.3d 162, 185 (2d Cir. 2012). Thus, when evaluating the adequacy of claims in a proposed amended complaint, we follow the standards applicable to a motion to dismiss brought under Rule 12(b)(6), "accepting as true all factual allegations in the complaint, and drawing all reasonable inferences in the plaintiff's favor." <u>Barrows v. Burwell</u>, 777 F.3d 106, 111 (2d Cir. 2015).

The standards of review under Rule 12(b)(2) apply to proposed amendments related to personal jurisdiction.[10]  We must construe all jurisdictional allegations "in the light most favorable to plaintiffs, resolving all doubts in their favor."  Porina v. Marward Shipping Co., 521 F.3d 122, 126 (2d Cir. 2008).  However, we may not "draw argumentative inferences in the plaintiff's favor," Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994) (internal quotation marks omitted), and need not "accept as true a legal conclusion couched as a factual allegation," Jazini v. Nissan Motor Co., 148 F.3d 181, 185 (2d Cir. 1998).  If the defendant challenges personal jurisdiction at the pleading stage, the plaintiff bears the burden of making a prima facie showing that personal jurisdiction exists.  See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A., 722 F.3d 81, 84-85 (2d Cir. 2013).  Jurisdiction must be "establish[ed] . . . with respect to each claim asserted."  Sunward, 362 F.3d at 24 (emphasis in original).  A motion to amend will be denied if the amended complaint does not provide "any basis to demonstrate that the

---

[10] With respect to actions brought in states other than New York and transferred here for pretrial proceedings under the MDL statute, 28 U.S.C. § 1407 (2012), we analyze whether personal jurisdiction exists in the transferor court, not in New York.  See In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000, 343 F. Supp. 2d 208, 213 (S.D.N.Y. 2004).  Nonetheless, we conduct this analysis according to the law not of the transferor circuit, but of the Second Circuit.  See In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig., No. 00-cv-1898 (SAS), 2005 WL 106936, at *5 (S.D.N.Y. Jan. 18, 2005); see also Menowitz v. Brown, 991 F.2d 36, 40 (2d Cir. 1993) (per curiam) ("[A] transferee court should apply its interpretations of federal law, not the constructions of federal law of the transferor circuit.").

district court would have [] personal jurisdiction" over a defendant. Spiegel v. Schulmann, 604 F.3d 72, 78 (2d Cir. 2010).

## 2. Amendments Related to Personal Jurisdiction

We first address the NCUA's and FFP plaintiffs' proposed amendments related to personal jurisdiction organized by the categories of claims to which the amendments correspond: (1) Counterparty Claims (i.e., common law claims against certain defendants based on their direct transactions with plaintiffs); (2) Indirect Counterparty Claims (i.e., common law claims against defendants based on plaintiffs' transactions with defendants' subsidiaries and affiliates); and (3) Non-Counterparty Claims (i.e., antitrust and common law claims against all defendants based on their alleged participation in an alleged conspiracy to manipulate LIBOR that occurred in London).

### 2.1. Counterparty Claims

For context and clarity, we summarize our previous jurisdictional rulings addressing common law claims against Counterparty defendants. For swap counterparties, we upheld specific jurisdiction "where a plaintiff was located when it entered into the swap agreement." LIBOR IV, WL 6243526, at *37. For bond counterparties, we upheld specific jurisdiction "where the bond was issued."[11]   Id.   As to both, we upheld specific

---

[11] In other words, bond obligors can be subjected to personal jurisdiction where "the bond was placed with an underwriter or agent for sale or marketing." LIBOR IV, WL 6243526, at *37.  The Court clarified this requirement during a

jurisdiction "where permitted by a forum selection clause, where the defendant's LIBOR submission was determined or transmitted, and where a trader requested an artificial LIBOR submission." Id. Finally, we upheld specific jurisdiction over claims arising out of the defendant's "course of dealing" in the plaintiff's forum state. See March 31, 2016 Order, 2016 WL 1301175, at *4; see also Schwab, 883 F.3d at 83 (allegations that defendants solicited and sold "financial instruments to Schwab in California" are sufficient to "make out a prima facie showing of personal jurisdiction for claims relating to those transactions.").

FFP plaintiffs misleadingly simplify the rulings of this Court and the Second Circuit by asserting that "even a single transaction can support personal jurisdiction over a defendant." Pls.' Joint Reply to Defs.' Opp. To Pls.' Mots. Leave to Amend on Jurisdictional and Venue Grounds ("Pls.' Joint PJ Br."), at 7, ECF No. 2667. Admittedly, there is no question that the commission of some single or occasional act may establish specific jurisdiction. See Daimler AG v. Bauman, 571 U.S. 117, 127 (2014). But as demonstrated by two cases that the Second Circuit cites in Schwab – Chloé v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158 (2d Cir. 2010) and Eades v. Kennedy, PC Law Offices, 799 F.3d 161 (2d Cir.

---

telephone conference on May 19, 2016: "The location of the underwriter is the office where the deal was actually done. That would include the relevant office of any other member of the syndicate. The same is true if there actually were agents involved. The locations do not include all the branch offices of any of these entities." Tr. 3:10-15, ECF No. 1429.

2015) – the analysis is far more nuanced than plaintiffs posit. In each case, the Circuit examined the defendant's contacts in the context of the defendant's overall relationship with the forum state. See Chloé, 616 F.3d at 170-71 (holding that specific jurisdiction in New York over the defendant was appropriate because the defendant had "developed and served a market for its products"); Eades, 799 F.3d at 168-69 (examining the quality and nature of the defendant's contacts – several mailings and telephone calls – with New York to establish specific jurisdiction). See also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 n.18 (1985) ("[S]ingle or occasional acts related to the forum may not be sufficient to establish [specific] jurisdiction if their nature and quality and the circumstances of their commission create only an attenuated affiliation." (citation and internal quotation marks omitted)). The analytical framework that we previously articulated for assessing defendants' suit-related contacts adheres to these binding precedents. See, e.g., LIBOR IV, WL 6243526, at *31 (The Court would "consider as a whole the defendants' suit-related contacts with the forum, including prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.") (citation and internal quotation marks omitted).

Consistent with our previous rulings and the aforementioned precedents, we allow moving plaintiffs' amendments that

sufficiently demonstrate a "course of dealing" in plaintiffs'
forum states. For example, Freddie Mac alleges that multiple
defendants and their affiliated entities solicited business and
sold mortgage-backed securities ("MBS") and mortgage loans to
Freddie Mac in Virginia.[12] See, e.g., Freddie Mac PTAC ¶¶ 23, 30,
45, 47, 68, 70, 87, 89, 99, 101, 116, 118, 129, 131, 167, 169.
Whereas the mere issuance of a LIBOR-based bond would not support
personal jurisdiction, see LIBOR IV, WL 6243526, at *37, plaintiffs
specifically allege that defendants purposely solicited and sold
LIBOR-based financial products directly to Freddie Mac. As we
held in the March 31, 2016 Order, such allegations of direct
solicitation or transactions between defendant and plaintiff are
sufficient to establish specific jurisdiction over defendant.

That said, we reject the NCUA's amendments that seek to
establish specific jurisdiction over defendants based on their
alleged contacts with Kansas. See NCUA PSAC ¶¶ 43-44. According
to the NCUA, its motion to amend is in response to a footnote in
LIBOR IV.[13] See 2015 WL 6243526 at *31 n.51 (disregarding the
NCUA's argument that defendants engaged with U.S. Central, a Kansas

---

[12] According to defendants, Freddie Mac fails to specify that the mortgage
loans were "tied to" LIBOR. See Joint Mem. of Law in Supp. of Defs' Mot.
Dismiss for Lack of Personal Jurisdiction and Venue and in Opp'n to Pls.' Mots.
Leave to Amend on Jurisdiction and Venue Grounds ("Defs.' Joint PJ Br."), at
28, ECF No. 2627. At oral argument, Freddie Mac confirmed that its common law
claims asserted against Counterparty defendants are all premised on the sale of
mortgage loans that are linked to LIBOR. Tr. 29:12-18, ECF No. 2792.
[13] Since none of the NCUA's proposed amendments is related to Schwab, we
note that the NCUA's motion for leave to amend could and should have been
brought following our decision in LIBOR IV and is thus untimely.

credit union, to execute certain transactions with four non-Kansas credit unions because the NCUA "cite[d] nothing in the complaint or declarations that specifically support[ed]" that argument). In the proposed amended complaint, the NCUA alleges, for example, that several defendants were "specifically on notice at the time of transacting with United, Southwest, or WesCorp of U.S. Central's role in those transactions." NCUA PSAC ¶44. Defendants were allegedly also on notice that "swap payments would be made to or from an account at U.S. Central" in Kansas.[14]  Id.  These allegations, however, do not show "where a plaintiff was located when it entered into the swap agreement." LIBOR IV, 2014 WL 6243526, at *37. The fact that the NCUA chose to pay defendants out of accounts controlled by U.S. Central in Kansas does not mean that defendants purposefully availed themselves of the privilege of conducting activities in Kansas. See Walden v. Fiore, 571 U.S. 277, 284 (2014).

We also reject Principal's proposed amendment regarding forum selection clauses in its swap agreements.[15] Principal asserts that

---

[14] The NCUA additionally alleges that securities sold to the credit unions were "routed through U.S. Central's safe-keeping accounts," and that "U.S. Central took custody of any securities sold to the Credit Unions" and "safe-kept any interest coupon on the securities sold by the Defendants to the Credit Unions."  NCUA PSAC ¶ 43.

[15] Both Principal and defendants raise arguments that we decline to address here.  First, Principal argued at oral argument that "several of the defendants have consented to personal jurisdiction in Iowa by registering with the Iowa Secretary of State," Tr. 70:23-71:2, but Principal does not propose any amendment relying on the defendants' registration in Iowa.  Even if we were to consider Principal's argument, we would most likely find it meritless under the Second Circuit precedents.  See, e.g., Brown v. Lockheed Martin Corp., 814 F.3d

19

we can exercise specific jurisdiction over Counterparty defendants based on their swap transactions with Principal because its ISDA agreements contained forum selection clauses designating the Southern District of New York as the parties' forum of choice. However, Principal's lawsuit was originally filed in Iowa and was subsequently transferred to this District for pre-trial proceedings. Therefore, "our task is to determine whether [courts in Iowa] may exercise personal jurisdiction," and a defendant's contractual consent to the jurisdiction of New York is irrelevant in making that determination. See LIBOR IV, WL 6243526, at *35.

Finally, defendants broadly assert that moving plaintiffs' proposed amended complaints do not allow the Court to assess each defendant's contacts individually because they collapse affiliated entities into one single defendant.[16] See Defs.' Joint PJ Br., at 34; Schwab, 883 F.3d at 84 (holding that Schwab's allegations as to Citibank, HSBC, and JPMorgan Chase could not establish jurisdiction over those banks because the allegations were not

---

619, 623 (2d Cir. 2016). Second, defendants assert that claims based on swap transactions fail because moving plaintiffs "fail to allege that they filed suit in the forum where the swap transactions were entered into." See Defs.' Joint PJ Br., at 31. Defendants seek to dismiss those claims, which were not the subject of any amendment, but do not move against any proposed amendment. Since we are now considering whether proposed amendments are futile in light of Schwab, we do not resolve those arguments, but note that the parties may raise them at the motion to dismiss stage.

[16] We have previously declined to exercise personal jurisdiction because of plaintiffs' insufficiently individualized allegations. See, e.g., March 31, 2016 Order, 2016 WL 1301175, at *4 (rejecting personal jurisdiction over Freddie Mac's claims related to bond transactions because Freddie Mac provided "no description as to what role any defendant played in any sale," "no description of any MBS transactions," and no "suggestion of which defendants in fact sold these products to plaintiff.").

sufficiently individualized).  However, defendants' argument is not persuasive, as plaintiffs allege specific defendant entities with which they transacted.  See, e.g., Principal Funds PSAC ¶¶ 27, 33, 37, 45, 50, 55, 65, 72.  After identifying each defendant and its role in various transactions, plaintiffs collectively refer to the affiliated entities under a single name.  See, e.g., Principal Funds PSAC ¶ 28.  Such a practice does not violate Rule 8(a)'s requirements.  See Wydner v. McMahon, 360 F.3d 73, 79 (2d Cir. 2004) (holding that the "key to Rule 8(a)'s requirements is whether adequate notice is given," and that "fair notice" is given when it allows the defendant "to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so that it may be assigned the proper form of trial" (citations and internal quotation marks omitted)).

### 2.2. Indirect Counterparty Claims

Though the corporate form is generally accorded respect under the law, an act taken by a corporate entity's subsidiary or affiliate can be imputed to the entity in certain circumstances for purposes of personal jurisdiction.  As explained in Schwab, it is "plausible that an agency relationship between a parent corporation and a subsidiary that sells securities on the parent's behalf could establish personal jurisdiction over the parent in a state in which the parent 'indirectly' sells the securities."  883 F.3d at 85-86.  To establish jurisdiction over an Indirect

Counterparty defendant, moving plaintiffs must plausibly allege that defendant's subsidiary or affiliate acted as defendant's agent in the relevant forum state "for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." Id. at 85 (quoting Grove Press, Inc. v. Angleton, 649 F.2d 121, 122 (2d Cir. 1981)); see also Ingenito v. Riri USA, Inc., 89 F. Supp. 3d 462, 476 (E.D.N.Y. 2015); CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 366 (2d Cir. 1986) ("To be considered an agent for jurisdictional purposes, the alleged agent must have acted in the state for the benefit of, and with the knowledge and consent of the non-resident principal." (citation and internal quotation marks omitted)).

We have previously addressed the applicable pleading standard for common law claims against Indirect Counterparty defendants. In LIBOR V, we considered whether two OTC plaintiffs, Texas Competitive Electric Holdings ("TCEH") and the SEIU Pension Plans Master Trust ("SEIU"), sufficiently alleged agency relationships between Credit Suisse Group AG ("CSGAG"), the parent entity, and its two affiliates, Credit Suisse International ("CSI") and Credit Suisse (USA), Inc. ("CSUSA").[17]  2015 WL 6696407, at *21.  TCEH alleged that it had traded a swap with CSI, and SEIU alleged that

---

[17]  Although TCEH and SEIU named CSGAG as the panel bank, Credit Suisse stated that Credit Suisse AG ("CSAG") was the panel bank.  See LIBOR V, 2015 WL 6696407, at *20 n.31, *22 n.34.  We granted only SEIU leave to make its agency allegations against CSAG instead of against CSGAG because we rejected TCEH's allegations of an agency relationship between CSI and CSGAG.  See id.

it had purchased corporate bonds issued by CSUSA from the issuer's broker-dealer affiliate. See LIBOR V, 2015 WL 6696407, at *21.

We found that TCEH's allegations, even if true, did not establish an agency relationship because TECH failed to show that CSGAG managed CSI's swap-trading operations, see Elbit Systems, Ltd. v. Credit Suisse Group, 917 F. Supp. 2d 217, 225-26 (S.D.N.Y. 2013), or directed the specific CSI activities at issue, see In re South African Apartheid Litigation, 617 F. Supp. 2d 228, 274-75 (S.D.N.Y. 2009). LIBOR V, 2015 WL 6696407, at *21. TCEH's conclusory allegations[18] of "corporate ownership, combined marketing, [and] shared board membership" were "insufficient to establish a principal-agent relationship between corporate entities." LIBOR V, 2015 WL 6696407, at *21 (citing Fletcher v. Atex, Inc., 68 F.3d 1451, 1459-62 (2d Cir. 1995)). See also Williams v. Yamaha Motor Co., 851 F.3d 1015, 1025 n.5 (9th Cir. 2017) (allegations that the parent and subsidiary are "the agents or employees of each other" and that the parent is "legally responsible" for the subsidiary are conclusory legal statements that cannot establish an agency relationship). Because TCEH failed to put forth any factual allegations that demonstrated how the

---

[18] TCEH alleged "that CSI is 'controlled' by CSGAG, that the two entities use the same brand and logo, that Credit Suisse presents itself as an 'integrated global bank,' that it 'takes a unified approach to risk management,' that CSI personnel reports to CSGAG personnel, that CSI is generally managed as part of CSGAG, that CSI shares revenue with CSGAG, that CSGAG lends money to CSI, that CSGAG and CSI have overlapping Boards of Directors, and that CSI adheres to CSGAG's employment policies." LIBOR V, 2015 WL 6696407, at *21.

bank <u>managed or directed</u> its agent's operations and activities, we rejected its attempt to establish personal jurisdiction over the principal (<u>i.e.</u>, Indirect Counterparty) bank.

In contrast, we reached a different conclusion with respect to SEIU. <u>Id.</u> at *22. Although SEIU and TCEH essentially advanced similar arguments, we reasoned that, unlike a discrete swap transaction, a bond issuance "is a major corporate event that officers and directors of the corporate parent would typically oversee." <u>Id.</u> It was unlikely that CSGAG allowed CSUSA to issue securities "without top-level approval," and it was plausible that CSUSA "acted at the direction of its corporate parents." <u>Id.</u> In other words, SEIU plausibly alleged that the agent acted "for the benefit of, with the knowledge and consent of, and under some control by" the principal bank. <u>Schwab</u>, 883 F.3d at 85. Thus, our analytical approach in assessing claims against Indirect Counterparty defendants has been very much in line with <u>Schwab</u>.

Moving plaintiffs' proposed amendments are indistinguishable from the ones made by TCEH: they similarly lack the requisite factual basis needed to support the conclusion that the subsidiary acted "for the benefit of, with the knowledge and consent of, and under some control by" the principal. The list of conclusory allegations of intra-corporate affiliations made by plaintiffs include: that each parent defendant operates the investment division as part of a single global business unit without regard

to corporate formalities and with common branding[19]; that each parent treats its subsidiary or affiliate's profits as the global unit's profits[20]; that the related entities have overlapping key executives[21]; and that the subsidiary's personnel reports to the parent defendant's personnel.[22]  These allegations, along with legal conclusions that defendants "knew of," "directed," and/or "benefited" from their subsidiaries or affiliates' transactions with plaintiffs,[23] are insufficient to establish personal jurisdiction over defendants.  See Jazini, 148 F.3d at 185 (declining to find specific jurisdiction over a parent entity based on its subsidiary's activities because the pleading "lacked the factual specificity" necessary to establish jurisdiction).

Freddie Mac's additional allegations that it internally considered the financial strength of the parent entities through its quarterly "Dealer Scorecards,"[24] in which defendants provided research notes to Freddie Mac,[25] do not demonstrate that the parent entities managed their subsidiaries' operations or directed their activities with Freddie Mac.  None of the amendments demonstrates

---

[19] See, e.g., Freddie Mac PTAC ¶¶ 40, 76, 114, 177; FDIC PSAC ¶¶ 38, 59, 90, 97; Principal Funds ¶¶ 30, 38, 54.
[20] See, e.g., Freddie Mac PTAC ¶¶ 40, 53, 76, 96, 97, 108; FDIC PSAC ¶¶ 64, 90; Principal Funds ¶¶ 30, 51, 62.
[21] See, e.g., Freddie Mac PTAC ¶¶ 41, 57, 76, 94, 196; FDIC PSAC ¶¶ 63, 68; Principal Funds PSAC ¶¶ 24, 31, 46.
[22] See, e.g., Freddie Mac PTAC ¶¶ 49, 58, 76, 90, 177, 112, 198.
[23] See, e.g., Freddie Mac PTAC ¶¶ 30, 40, 45, 60, 76, 94, 108, 125, 140.
[24] Freddie Mac PTAC ¶¶ 12-14, 31, 46, 69, 88, 100, 117, 130, 151, 168, 191.
[25] Freddie Mac PTAC ¶¶ 61, 95, 119, 132, 160.

that the affiliate or subsidiary entity conducted the transactions with Freddie Mac "for the benefit of, with the knowledge and consent of, and under some control by" the parent entity.

However, Freddie Mac's allegations regarding Royal Bank of Scotland ("RBS") and its non-defendant subsidiary, RBS Securities Inc. ("RBSI"), suffice to establish specific jurisdiction over RBS. Freddie Mac alleges that RBSI's sale of MBS to Freddie Mac was a part of a strategy that was directed by RBS's executives to "overvalue asset-backed securities to protect RBS's reputation." Freddie Mac PTAC ¶ 178. Since we have found that RBSI's activities of soliciting Freddie Mac are sufficient to establish specific jurisdiction over RBSI, see supra Part III.2.1., and since Freddie Mac plausibly alleges that RBS managed RBSI's operations and directed its transactions with Freddie Mac, we can exercise jurisdiction over RBS based on RBSI's activities in Virginia.[26]

### 2.3. Non-Counterparty Claims and Conspiracy Jurisdiction

Moving plaintiffs assert that certain acts taken by several defendants, who are mostly domestic banks, can establish personal

---

[26] Defendants argue that plaintiffs must show the parent entity's "pervasive control" over its agent. Defs.' Joint PJ Br., at 38 (quoting Wilder v. News Corp., No. 11-cv-4947 (PGG), 2015 WL 5853763, at *6 (S.D.N.Y. Oct. 7, 2015)). However, plaintiffs correctly point out that Judge Gardephe's ruling in Wilder only concerns whether "a foreign subsidiary of a United States corporation may be subject to general jurisdiction in the United States on the basis of the parent-subsidiary relationship." Id. (emphasis added). In contrast, under consideration in our case is whether an affiliate's specific acts (i.e., transactions involving LIBOR-based instruments) can establish specific jurisdiction over its parent for legal claims based on those transactions.

jurisdiction over all defendants, including foreign bank defendants who did not have any contractual relationships with plaintiffs, for fraud and antitrust claims. The acts allegedly constitute overt acts that furthered "a conspiracy aimed at the projection of financial soundness." LIBOR VI, 2016 WL 7378980, at *7. Accordingly, moving plaintiffs claim that all defendants, regardless of their domiciles or membership on the LIBOR panel, can be haled into this Court applying conspiracy jurisdiction.

It is important to note at the threshold that, given the relevant holdings of Schwab, this Court may not exercise personal jurisdiction over Non-Counterparty defendants for fraud and antitrust claims if moving plaintiffs cannot invoke (or rely upon) conspiracy jurisdiction. First, Schwab held that this Court cannot exercise specific jurisdiction over fraud claims premised on LIBOR submissions in London because "activities in London do not constitute" contacts with the relevant forum states.[27]  883 F.3d at 84. Second, Schwab rejected the assertion that, since the effects of LIBOR manipulation on California were "foreseeable," personal jurisdiction should attach, because the conduct was not expressly aimed at the state. Id. at 87. Although the Second Circuit rejected the "foreseeability" argument only in the context

---

[27] Although Schwab made it clear that specific jurisdiction does not exist over defendants for fraud claims, the Circuit's reasoning applies equally to tortious interference claims, which are also predicated on allegedly false LIBOR submissions in London. See infra at Part IV.3.5.

of Schwab's California transaction claims, the Circuit's rationale effectively affirms our prior rulings that the manipulation of LIBOR was not expressly aimed at the United States. See LIBOR IV, 2015 WL 6243526, at *32 ("[T]here is no suggestion, and it does not stand to reason, that foreign defendants aimed their manipulative conduct at the United States or any particular forum state."); LIBOR VI, 2016 WL 7378980, at *9 (holding that the conduct did not have sufficient contacts with the United States to establish jurisdiction over all defendants for antitrust claims). Given that LIBOR was "the world's most important number" that served as "one of the most reliable barometers of risk in the global economy," Freddie Mac PTAC ¶ 2, it is simply implausible that defendants expressly aimed their conduct at the United States.

In LIBOR VI, we declined to express an opinion as to "whether conspiracy jurisdiction survives as a doctrine" after the Walden decision and recent opinions[28] in the Southern District of New York because plaintiffs did not plausibly allege that "any defendant committed an act pursuant to the alleged conspiracy in the United

---

[28] For example, Judge Forrest rejected the idea that an assertion of participation in a conspiracy "generally can provide a standalone basis for jurisdiction subject only to the constraints of due process." In re Alumnium Warehousing Antitrust Litigation, 90 F. Supp. 3d 219, 227 (S.D.N.Y. 2015). If a foreign entity participated in a conspiracy but did not have sufficient contacts with the United States, then personal jurisdiction could not be exercised over that entity based on a co-conspirator's act that occurred in or was expressly aimed at the United States. Id. However, if the entity "in fact engaged in some affirmative act directed at the forum," the rules and doctrines applicable to personal jurisdiction, such as Walden, are sufficient to establish personal jurisdiction without conspiracy jurisdiction. Id.

States." 2016 WL 7378980, at *12. In light of the Schwab decision, we do not question whether conspiracy jurisdiction is a cognizable basis for personal jurisdiction in this Circuit.

However, any discussion of conspiracy jurisdiction must be approached with caution. For one, the states in which Schwab,[29] Principal,[30] and the FDIC[31] bring their state law claims either reject conspiracy jurisdiction or impose more stringent requirements than the ones adopted by Schwab. Moreover, a cautious approach to the exercise of conspiracy jurisdiction finds support in the criminal law and, more broadly, in jurisdiction jurisprudence. For example, in the criminal law, from which the theory of conspiracy jurisdiction is derived, a co-conspirator's statement allegedly made in furtherance of a conspiracy is admissible at trial (despite a grand jury indictment) only after a trial court finds by a preponderance of the evidence that the conspiracy existed and that both the declarant and the defendant

---

[29] California does not recognize conspiracy as a basis for asserting jurisdiction over a non-forum defendant. See, e.g., Murphy v. Am. Gen. Life Ins. Co., No. ED CV14-00486 (JAK)(SPX), 2015 WL 4379834, at *9 (C.D. Cal. July 15, 2015); Mansour v. Superior Court, 38 Cal. App. 4th 1750, 1760 (1995).

[30] A federal court in Iowa found that conspiracy jurisdiction was not cognizable under Iowa law. See Brown v. Kerkhoff, 504 F. Supp. 2d 464, 518 (S.D. Iowa 2007) ("This Court concludes a nonresident's alleged participation in a conspiracy cannot serve as a constitutionally sufficient basis to exercise in personam jurisdiction over that individual in situations which would otherwise fail the "minimum contacts" approach. As a result, Plaintiffs' allegations of a conspiracy cannot serve as an independent basis for the exercise of in personam jurisdiction over the nonresident Defendants.").

[31] Under New York law, a plaintiff must allege that a defendant exercised direction or control over the co-conspirator to establish conspiracy jurisdiction over the defendant. See, e.g., Related Companies, L.P. v. Ruthling, No. 17-cv-4175, 2017 WL 6507759, at *13 (S.D.N.Y. Dec. 18, 2017).

were part of that conspiracy.[32]  See <u>Bourjaily v. United States</u>, 483 U.S. 171, 175-76 (1987).  Additionally, "a defendant who does not directly commit a substantive offense" can be liable only if a co-conspirator's commission of the offense in furtherance of the conspiracy was "<u>reasonably foreseeable</u> to the defendant as a consequence of their criminal agreement."  <u>Cephas v. Nash</u>, 328 F.3d 98, 101 n.3 (2d Cir. 2003) (emphasis added).[33]  While a wholesale importation of concepts from criminal law is admittedly unwarranted, a cautious assessment of allegations of conspiracy jurisdiction seems particularly appropriate in this case, where moving plaintiffs are relying on random acts taken mainly by domestic banks to establish jurisdiction over foreign defendants who had no direct contacts with plaintiffs whatsoever.  An expansive exercise of extraterritorial jurisdiction would not only create comity issues; it would contravene the central dictate of the Supreme Court's ruling in <u>Walden</u> that, under the due process analysis, we must look to the contacts that each defendant himself or herself created with the forum.  See 571 U.S. at 284.

---

[32] We certainly recognize that the burden of proof in a criminal trial is different from the pleading stage of a civil case.

[33]  Interestingly, the First Circuit has adopted "reasonable foreseeability" as one of the pleading requirements that a plaintiff must meet to establish conspiracy jurisdiction over a non-forum defendant.  See <u>Glaros v. Perse</u>, 628 F.2d 679, 682 (1st Cir. 1980) ("But, to sustain jurisdiction over an out-of-state co-conspirator these courts required something more than the presence of a co-conspirator within the forum state, such as substantial acts performed there in furtherance of the conspiracy and of which the out-of-state co-conspirator was or should have been aware.").

Many of the acts that moving plaintiffs now seek to allege for purposes of establishing conspiracy jurisdiction have previously been considered as potential grounds for jurisdiction and rejected by the Court because plaintiffs either: (1) sought to use the acts to establish specific jurisdiction for claims that did not arise out of those acts,[34] see LIBOR IV, 2015 WL 6243526, at *30; or (2) failed "to carry their burden of making a prima facie showing of minimum contacts" created by the acts,[35] LIBOR VI, 2016 WL 7378980, at *11.[36] Although plaintiffs insist that a different outcome is now warranted in light of Schwab, see Pls. Joint PJ Br., at 22, they are mistaken, as that decision affirmed our analytical framework for assessing acts by defendants that allegedly furthered the sufficiently pled conspiracy.

In LIBOR VI, we explained that, since the actual conspiratorial agreement took place in a foreign jurisdiction, special attention must be given to whether plaintiffs meet the

---

[34] Plaintiffs previously tried to establish specific jurisdiction over Panel Bank defendants and the BBA for claims based on their alleged manipulation of LIBOR in London by alleging that they made "false representations about the quality of LIBOR [in the United States] in order to reassure the public after the emergence of reports that LIBOR was being manipulated." LIBOR IV, 2015 WL 6243526, at *29.

[35] The alleged acts rejected in LIBOR VI that moving plaintiffs repackage as new amendments include: defendants' sales and trades of LIBOR-based products to plaintiffs in the United States; defendants' marketing activities; and unestablished claims that senior executives at Citibank, JPMorgan, and Barclays directed the LIBOR manipulation from the United States. 2016 WL 7378980, at *9-11. We found that none of these acts constituted sufficient contact with the United States. Id. at *9.

[36] While moving plaintiffs also put forth allegations of acts by defendants that we have not considered before, for reasons explained below, they still fail to allege plausibly that "any defendant committed an act pursuant to the pled conspiracy in the United States." LIBOR VI, 2016 WL 7378980, at *9.

"purposeful availment" prong of the due process analysis by plausibly alleging that overt acts in furtherance of the reputation-driven conspiracy occurred in or were aimed at the United States. Id. at *8. In addition, we found that "defendants' sales and trades of LIBOR-based products to plaintiffs in the United States are not within the scope of the reputation-motivated antitrust conspiracy" and could not be considered as overt acts in furtherance of the conspiracy.[37] Id. at *9. In other words, plaintiffs' allegations of conspiracy jurisdiction must meet two requirements: 1) defendants' acts must have constituted sufficient contact with the relevant forum; and 2) the acts furthered the conspiracy to project financial soundness.

The Second Circuit effectively adopted these requirements in Schwab. The Circuit held that, in order to establish jurisdiction over a non-forum defendant based on the acts committed by the defendant's co-conspirator, plaintiffs must show that "[the] co-conspirator's overt acts in furtherance of the conspiracy had

---

[37] In LIBOR VI, we rejected plaintiffs' characterization of the conspiracy as "one with a profit motive" based on the Second Circuit's opinion in Gelboim, which stated: "[C]ommon sense dictates that the Banks operated not just as borrowers but also as lenders in transactions that referenced LIBOR. Banks do not stockpile money, any more than bakers stockpile yeast. It seems strange that this or that bank (or any bank) would conspire to gain, as a borrower, profits that would be offset by a parity of losses it would suffer as a lender." Gelboim, 823 F.3d at 783. As we explained, the actual goal of the sufficiently pled conspiracy – in which Panel Bank defendants participated through the LIBOR setting process in London – was the "projection of financial soundness." 2016 WL 7378980, at *7. This was in turn based on our interpretation of the phrase "increased profits and the projection of financial soundness" in Gelboim, 823 F.3d at 782, as describing "collectively a single, reputation-based motive to conspire, where increased profits followed from a positive reputation," LIBOR VI, 2016 WL 7378980, at *5.

32

sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." _Schwab_, 883 F.3d at 87 (citing _Unspam_, 716 F.3d at 329). Thus, overt acts are not themselves sufficient; rather, it is essential that the acts be in furtherance of the pled conspiracy. _See id._ ("To allow jurisdiction absent a showing that a co-conspirator's minimum contacts were in furtherance of the conspiracy would be inconsistent with the 'purposeful availment' requirement."). Here, given that the object of the plausibly alleged conspiracy was to project financial soundness, an act that does not further the reputation-enhancing object of the conspiracy – such as a defendant's activities related to the sale of LIBOR-based instruments that can only further their "financial self-interest" – is not sufficient to establish conspiracy jurisdiction. _See id._ ("[T]he conspiracy to manipulate LIBOR had nothing to do with the California transactions, and there is thus no reason to impute the California contacts to the co-conspirators.").

In a desperate attempt to establish conspiracy jurisdiction over defendants with no forum contacts of their own, FFP plaintiffs try to expand the scope of the pled conspiracy and plead random acts by defendants that allegedly furthered the conspiracy as expanded. First, Freddie Mac asserts – directly contrary to _Schwab_ – that, since "numerous Panel Bank Defendants profited from their positive reputation with Freddie Mac," defendants' acts that

facilitated business transactions with Freddie Mac furthered "the conspiracy's profit objectives." See Freddie Mac's PJ Mem., at 18. But as we held in LIBOR VI, though "increased profits followed from a positive reputation," defendants' potential profit motive was not a part of the sufficiently pled conspiracy.[38] 2016 WL 7378980, at *5. Second, FFP plaintiffs argue that conspiracy jurisdiction can be established over all defendants for fraud claims; yet they fail to put forth any plausible allegation that defendants conspired to commit fraud.[39] Third, despite our repeated rulings, FFP plaintiffs re-allege the "boycott" theory in which defendants allegedly fixed the market for benchmark rates. See, e.g., Principal Financial SAC ¶¶ 288-93. In LIBOR VI, we declined, for the second time, to consider the viability of the "boycott" theory, holding that Gelboim "did not revive an

---

[38] For example, Freddie Mac alleges that it authorized its traders to conduct transactions with only counterparties that were pre-approved by Freddie Mac's Counterparty Credit Risk Management group ("CCRM"). Freddie Mac PTAC ¶¶ 11-14, 23. The CCRM allegedly calculated each counterparty bank's perceived credit risk based on information provided by the banks. Id. As the allegation only speaks to defendants' profit motive, we reject Freddie Mac's assertion that defendants' contacts with CCRM plausibly furthered the pled conspiracy. See Schwab, 883 F.3d at 87 (rejecting the notion that sales-related activities furthered the conspiracy). Furthermore, there is no causal relationship between defendants' alleged contacts and the conspiracy to manipulate LIBOR because Freddie Mac does not allege that the information provided by defendants in the pre-approval process included any LIBOR data or was even related to LIBOR. See id. (holding that Schwab must show a causal relationship between a defendant's in-forum contacts (e.g., transactions in California) and the conspiracy).

[39] In our view, FFP plaintiffs' allegation of a fraud-based conspiracy is merely an end run around this Court's interpretation of Gelboim that found defendants' profit motive to be excluded from the scope of the sufficiently pled conspiracy to manipulate LIBOR. In any event, even if FFP plaintiffs plausibly allege a conspiracy to commit fraud, none of defendants' acts, as discussed infra, see Part III.2.4, constitutes sufficient contact with the United States (and, a fortiori, with plaintiffs' forum states).

34

alternative theory of antitrust violation."  2016 WL 7378980, at
*2  n.3.    FFP  plaintiffs  subsequently  filed  motions  for
reconsideration of our decision to reject the theory, which we
denied.  See Mem. & Order, 2017 WL 946338, at *1 (S.D.N.Y. Feb.
16, 2017), ECF No. 1774.  In re-alleging the theory, FFP plaintiffs
simply state – incorrectly - that the "boycott" theory is "one
aspect  of  the  much  larger  persistent  suppression  conspiracy."
Pls.' Joint PJ Br., at 18.   However, since the theory "was
dismissed by this Court and [was] neither before nor addressed by
the Second Circuit [in Gelboim]," we reject for the fourth and
final time FFP plaintiffs' assertion that personal jurisdiction
can be premised on the "boycott" theory.  Id. at *3.  In sum, all
of these allegations go beyond the scope of the conspiracy that
the Second Circuit and this Court previously defined, we reject
the proposed amendments by FFP plaintiffs.

### 2.4. "Overt Acts" in Furtherance of the Conspiracy

With our prior rulings, Schwab, and the clearly defined scope
of the plausibly pled conspiracy in mind, we next consider seriatim
each  "overt  act"  that  moving  plaintiffs  allege  defendants
committed in furtherance of the conspiracy.

Directing LIBOR Suppression from the United States

We previously considered and rejected the allegations that
executives at certain defendant banks in the United States directed
LIBOR submitters to suppress their submissions.  See LIBOR VI,

2016 WL 7378980, at *11. Citing "newly discovered" facts, moving plaintiffs now propose amendments designed to "clarify and/or supplement the allegations" that were addressed in LIBOR VI. Pls.' Joint PJ Br., at 27. The proposed amendments, however, do not make the allegations concerning conspiracy jurisdiction any more plausible. For example, in LIBOR VI, we observed, based on supporting material submitted by FFP plaintiffs, that Barclays' former CEO Robert Diamond may have directed BCI Executive Officer Jerry del Missier to submit low LIBOR rates. 2016 WL 7378980, at *10 n.17. Plaintiffs now allege that Mr. Diamond worked from Barclays' New York office when he made a phone call to direct Mr. del Missier to submit low LIBOR rates. Freddie Mac PTAC ¶ 340. However, a single telephone call that was allegedly "interpreted" as an "instruction to artificially suppress" LIBOR submissions at one bank, see Freddie Mac PTAC ¶ 340, could not have furthered the conspiracy to project the financial soundness of all Panel Banks. Without any factual allegation that the conversation took place between two or more Panel Banks, it is more plausible that the alleged call furthered only Barclays' projection of financial soundness. Furthermore, Freddie Mac does not allege that Mr. Diamond was in fact in New York when he made the call; rather, it alleges that he "worked out of Barclays' New York offices" during the alleged LIBOR suppression period. Without any allegation that Mr. Diamond physically made the call from his New York office, we

cannot draw an argumentative inference in Freddie Mac's favor even if it was relevant.  See Overseas Military, 21 F.3d at 507.

Other amendments based on newly discovered intrabank communications do not fare any better.  Moving plaintiffs assert that the communications show how executives at several defendant banks in New York allegedly directed their own LIBOR submitters to submit artificially suppressed submissions.  See, e.g., Freddie Mac PTAC 269, 274-79, 293, 316, 338.  However, as a substantive matter, the communications are "nothing more than intrabank communications regarding the executive's thoughts on LIBOR levels."[40]  LIBOR VI, 2016 WL 7378980, at *11; see also LIBOR IV, 2015 WL 6243526, at *60 (such communications do not "purport[ ] to do anything more than to state a sincere opinion based on publicly available information").  In sum, none of plaintiffs' allegations makes a prima facie showing of acts on the part of defendants, within the United States, and in furtherance of the conspiracy.

Transmission of Individual LIBOR Submissions to Plaintiffs

We have previously considered and rejected the assertion that defendants' alleged transmissions of individual LIBOR submissions and daily LIBOR rates to the United States established personal

---

[40] Plaintiffs also discuss an email exchange between Scott Bere, Citibank's Head of Risk Treasury, and John Porter, Barclays Capital's Global Head of Portfolio and Liquidity Management.  In the email, Mr. Bere allegedly told Mr. Porter to examine Barclays' LIBOR submissions because they "appear to be high." Freddie Mac PTAC ¶ 274.  No reasonable person would see this email communication as an indication that either Mr. Bere or Mr. Porter directed anyone to submit false LIBOR submissions from the United States.

jurisdiction over defendants in the United States.  See LIBOR IV,
2015 WL 6243526, at *29-30 (rejecting the argument that defendants'
transmissions of LIBOR rates to plaintiffs established
jurisdiction); LIBOR VI, 2016 WL 7378980, at *10 (rejecting the
allegation that defendants transmitted their individual LIBOR
submissions from the United States to Thomson Reuters in New York).
Freddie Mac's allegation that defendants published LIBOR data via
several data vendors, see Freddie Mac PTAC ¶ 239, is substantially
identical to those previous assertions and is thus rejected.

Freddie Mac also alleges that Bank of America directly sent
its LIBOR submissions to Freddie Mac.  Id. ¶ 239.  Even assuming
arguendo that Bank of America's act constituted contacts
sufficient to establish jurisdiction in the United States,[41] the
conduct did not further the conspiracy.  After calculating the
LIBOR rate, every Panel Bank's submission was published.  LIBOR I,
935 F. Supp. 2d at 679.  "Therefore, it is a matter of public
knowledge . . . what quote each bank submitted and how the final
fix was calculated."  Id.  Thus, even assuming that, in addition
to daily worldwide publication, Bank of America sent their own
LIBOR quotes to Freddie Mac, the transmissions could not have
furthered the conspiracy to project the financial soundness of all
Panel Banks.  At best, the transmissions helped with Bank of

---

[41] In LIBOR VI, we found personal jurisdiction over the FDIC's antitrust
claims against the Bank of America entities, so this issue is academic.

America's solicitation of business, and such sales-related activities do not further the alleged conspiracy.

Acts of "False Assurance"

As a threshold matter, we reject FFP plaintiffs' attempt to cast the BBA as a member of the plausibly pled conspiracy and thereby reject their efforts to rely on the BBA's acts in the United States for jurisdictional purposes. Even FFP plaintiffs point out that the BBA's incentive was "to portray LIBOR as a reliable benchmark, to appease its constituent members and to profit from the licensing of LIBOR," Pls.' Joint PJ Br., at 21. Thus, the BBA is not a financial institution whose main concern is to project financial soundness, and any act of assurance that the BBA allegedly took did not further the alleged conspiracy.[42]

With respect to other defendants that arguably fall within the scope of the pled conspiracy, there is no question that an act of concealment can constitute an overt act in furtherance of the conspiracy. See, e.g., United States v. Grant, 683 F.3d 639, 648-49 (5th Cir. 2012) ("[E]fforts to conceal an ongoing conspiracy obviously can further the conspiracy by assuring that the conspirators will not be revealed and the conspiracy brought to an end."); Grunewald v. United States, 353 U.S. 391, 405 (1957) (holding that an act of concealment occurring after the conspiracy

---

[42] This ruling is separate from the issue of whether, in the context of inquiry notice, a plaintiff reasonably relied on the BBA's statements about the accuracy of LIBOR. See Schwab, 883 F.3d at 96-98.

ended could still be seen as furthering the conspiracy if prosecutors could prove the existence of an express original agreement to conceal the conspiracy).  In their proposed amended complaints, plaintiffs assert that defendants' publications and statements about the quality of LIBOR – and their transmission of the publications directly to plaintiffs – served to conceal the conspiracy and, consequently, establish jurisdiction over all defendants.  See, e.g., Freddie Mac PTAC ¶¶ 119, 132, 160, 193, 320, 406; Principal Financial PSAC ¶¶ 263, 265-67.

However, moving plaintiffs do not plausibly demonstrate how the acts could have provided false assurance or furthered the conspiracy.  For example, Freddie Mac alleges that several defendants published and distributed in the United States general reports on "global or U.S. Fixed Income Strategy, which included analyses on" LIBOR, e.g., Freddie Mac PTAC ¶¶ 33, 61, 70, 95, 119, 132, 160, but Freddie Mac does not identify anything in the reports that serves as, or can even be interpreted as, false assurance about the quality of LIBOR.  In fact, the reports were designed "for the purpose of soliciting and engaging in financial transactions."  E.g., Freddie Mac PTAC ¶¶ 70, 80, 89, 101, 118, 131, 146, 169, 192.  Thus, the reports furthered the financial self-interest of the individual banks who published them, and they did not further a conspiracy to project financial soundness for sixteen Panel Banks.  See Schwab, 883 F.3d at 87.

Moreover, applying the Supreme Court's analysis in Calder v. Jones, 465 U.S. 783 (1984), we find that none of the "false assurance" acts constituted sufficient contact with the United States. In Calder, the Supreme Court considered a libel suit in California state court that sought to establish specific jurisdiction over two defendants who worked for a national newspaper company headquartered in Florida. Id. at 784-86. The plaintiff's libel claims were based on a newspaper article written and edited by the defendants in Florida that was subsequently distributed in California and the rest of the country. Id. The Court examined the various contacts the defendants had with California (as opposed to the contacts the defendants had with the plaintiff) and found those forum contacts to be sufficient: "The defendants relied on phone calls to 'California sources' for the information in their article; they wrote the story about the plaintiff's activities in California; they caused reputational injury in California by writing an allegedly libelous article that was widely circulated in the State; and the 'brunt' of that injury was suffered by the plaintiff in that State." Walden, 571 U.S. at 287. The injury caused by the news article in California "connected the defendants' conduct to California, not just to a plaintiff who lived there." Id. Therefore, California was "the focal point both of the story and of the harm suffered." Calder,

465 U.S. at 789.  Jurisdiction was proper "based on the 'effects' of their Florida conduct in California."  Id.

Unlike the defendants' acts in Calder, none of the acts in the instant case were specifically targeted at causing injury in the United States.  For example, Freddie Mac alleges that JPMorgan published a research note in response to the May 29, 2018 article that questioned the accuracy of several defendants' LIBOR submissions.  Freddie Mac PTAC ¶ 317, 406.  There is no allegation that the note, which criticized the research methodology used by the article, was specifically published for or targeted at Freddie Mac or the United States.  Rather, the note was distributed to subscribers of the Bloomberg Terminal, see id. ¶ 406 n.457, "which sits on the desk of more than 300,000 of the 'world's most influential decision makers,'" id. ¶ 64 n.38.  In other words, the note ended up in the hands of investors throughout the world.  JPMorgan's act thus mirrors the words of Henry Wadsworth Longfellow: "I shot an arrow into the air; It fell to earth, I knew not where; For, as swiftly it flew, the sight; Could not follow it in its flight."  By Freddie Mac's logic, JPMorgan would be subject to "de facto universal jurisdiction" throughout the world.  Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc., 751 F.3d 796, 801 (7th Cir. 2014).

In sum, moving plaintiffs fail to show that defendants' acts furthered the pled conspiracy or had sufficient contacts with the

United States.  Thus, we need not address whether the exercise of jurisdiction would comport with traditional notions of fair play and substantial justice.  We also need not reach defendants' argument regarding lack of venue under the Clayton Act.[43]

### 3.  Other Amendments

In this section, we address plaintiffs' amendments that are not related to personal jurisdiction.  We conclude that almost all of the amendments do not comport with the dictates of <u>Schwab</u> and are thus futile.  We consider each amendment <u>seriatim</u>.

### 3.1. Lender Plaintiffs' Proposed Amendments

In <u>LIBOR V</u>, we dismissed the fraud claims asserted by Government Development Bank for Puerto Rico ("GDB") as time-barred because the bank was on inquiry notice of the basis for all of its claims by May 31, 2010, but failed to assert them until November 21, 2012.  2015 WL 6696407, at *12-13.  We assumed without deciding that Puerto Rico would apply the "weak inquiry notice" rule because GDB's claims were time-barred even under that plaintiff-friendly rule.  <u>Id.</u>  However, we now find that Puerto Rico has a "strong inquiry notice" rule, under which the statute of limitations begins to run on the inquiry notice date.  <u>See</u> <u>infra</u> Part IV.5.1. Therefore, GDB's claims expired on May 31, 2011.  After <u>Schwab</u>,

---

[43] We explicitly note that, even if the BBA were a member of the conspiracy, it is not subject to the Clayton Act's venue provision because the BBA is not "a corporation" as defined by the Act.  <u>See</u> 15 U.S.C. § 22; <u>World Skating Fed'n v. Int'l Skating Union</u>, 357 F. Supp. 2d 661, 664 (S.D.N.Y. 2005).

Lender plaintiffs concurrently filed a motion for leave to amend, see ECF No. 2552, and a pre-motion letter seeking leave to move for reconsideration of LIBOR V, see ECF No. 2555. They argued that, by reversing our partial dismissal of Schwab's unjust enrichment claims under California law, Schwab changed the controlling law of this case and thereby reinstated GDB's fraud claims. Mem. Law in Supp. of GDB Mot. Leave to Amend ("Lender Pls.' Br."), at 9, ECF No. 2572. Failing to recognize the variations in state law, Lender plaintiffs requested that we reconsider our analysis of Puerto Rico law in light of the Second Circuit's decision.[44] See Mem. & Order, 2018 WL 3222518, at *1 (S.D.N.Y. Jul. 2, 2018), ECF No. 2607 ("July 2, 2018 Order").

We denied Lender plaintiffs' request to move for reconsideration in July 2018, and we see no reason to rule otherwise on their duplicative motion for leave to amend. In their motion, Lender plaintiffs argue that Puerto Rico recognizes a "defendant reassurance" exception, see Reply to Defs.' Opp. to Pls.' Mots. Leave to Amend Compls. ("Pls.' Joint Non-PJ Br."), at 22, ECF No. 2666, even though we held in the July 2, 2018 Order that our analysis would not change even if the exception applied.[45]

---

[44] Lender plaintiffs' utter failure to grasp state law variations is evidenced in their pre-motion letter. Lender plaintiffs did not "consider, address, or even cite any Puerto Rico law in contending that we should reconsider our prior analysis of Puerto Rico law." July 2, 2018 Order, 2018 WL 3222518, at *1.

[45] We now explicitly hold that the "defendant reassurance" exception does not apply to GDB's claims because Lender plaintiffs do not allege that GDB conducted reasonable due diligence to discover fraudulently concealed material

2018 WL 3222518, at *2.  In view of the foregoing, and because there is no question that GDB's claims were filed after the statute of limitations had run, Lender plaintiffs' motion is denied.

### 3.2. NCUA's Proposed Amendments

The NCUA moves to add amendments detailing its LIBOR-based transactions in asset-backed securities.[46]  See NCUA PSAC ¶¶ 235-236, 239-240, 243-244, 247-251, 254.  Whether the NCUA has standing to bring antitrust claims as a beneficiary of the trusts is discussed in our consideration of FFP plaintiffs' proposed amendments regarding asset-backed securities.  To the extent that the NCUA bases its antitrust claims on transactions with non-defendant third parties, we reject the amendments based on our ruling in LIBOR VI.  See 2016 WL 7378980, at *16.

### 3.3. FFP Plaintiffs' Proposed Amendments[47]

FFP Plaintiffs' Attempt to Expand the Suppression Period

FFP plaintiffs seek to extend the end of the alleged suppression period from May 2010 to October 2011 based on the indictment of two former employees of Société Générale and the

_____

facts after it had been put on inquiry notice in May 2010.  See, e.g., Maurás v. Banco Popular De Puerto Rico, Inc., No. 16-2864 (BJM), 2017 WL 5158677, at *6 (D.P.R. Nov. 7, 2017); Garcia Colon v. Garcia Rinaldi, 340 F. Supp. 2d 113, 121-22 (D.P.R. 2004).

[46] The NCUA claims that it engaged in 2,237 transactions involving asset-backed securities ("ABS").  See Letter from Andrew Shen to the Court, Feb. 1, 2019, ECF No. 2790.  2,033 of those transactions involved residential mortgage-backed securities, and the rest of the transactions (except for two that involved corporate bonds) involved assets such as aircrafts, automobiles, commercial mortgages, credit card debt, and student loan collateral.  Id.

[47] We do not consider Freddie Mac's request to add Barclays Capital as a defendant because it withdrew the request.  See Pls.' Joint Non-PJ Br., at 17 n.23.

bank's recent settlements with U.S. regulators. See, e.g., FDIC PSAC ¶ 1; Freddie Mac PTAC ¶ 7. We have previously considered the implications of the indictment for this MDL when the Direct Action plaintiffs ("DAP"), which include FFP plaintiffs, filed a motion to defer their deadline to move for reconsideration in light of the indictment until after the Second Circuit ruled on the appeals from LIBOR IV and LIBOR VI. See Letter from James Martin to the Court, Sep. 14, 2017, ECF No. 2263. We denied the motion because the indictment "does not contain any previously unknown facts of relevance" and "does [not] alter the factual and legal bases underlying this Court's prior decisions." Sep. 26, 2017 Order, ECF No. 2289.

We reject FFP plaintiffs' proposed amendments for the same reasons. The settlements[48] contain no allegation or finding that an inter-bank persistent suppression conspiracy existed. In addition, there is no suggestion that false LIBOR submissions were submitted from or directed by individuals in the United States. The assertion that the internal documents allegedly show "all Panel Bank Defendants manipulated their submissions," see, e.g., FDIC PSAC ¶ 306, does not find any support in the documents themselves. Since we deny FFP plaintiffs' attempt to expand the relevant time

---

[48] The settlements include the bank's deferred prosecution agreement with the U.S. Department of Justice, see Deferred Prosecution Agreement, United States v. Société Générale S.A., No. 18-cr-253 (E.D.N.Y. Jun. 5, 2018), and the bank's settlement with the Commodity Futures Trading Commission, see Order, In the Matter of Société Générale S.A., CFTC No. 18-14 (June 4, 2018).

period, we do not address defendants' arguments to dismiss claims that are premised on the new conduct period as untimely.[49]

### Standing to Bring Claims Premised on Asset-Backed Securities

Like the NCUA, FFP plaintiffs move to add amendments detailing their transactions of LIBOR-based ABS. See, e.g., Freddie Mac PTAC ¶¶ 56, 85, 94, 122, 140, 177; FDIC PSAC ¶¶ 68, 89; Principal Financial PSAC ¶¶ 31, 46, 230-39. In LIBOR IV, we found that, "[w]hen an investor holds an asset-backed security, the investor actually holds a certificate as evidence that the investor is entitled to certain disbursements as beneficiary of a trust." 2014 WL 6243526, at *84. Furthermore, the trust "has legal personality and acts through its trustee, who (at least following a default) is a fiduciary for the investors collectively." Id. Therefore, the NCUA and FFP plaintiffs must show that they are proper parties to maintain contract-related claims against the trust's counterparties. Id. at *85.

Defendants argue that individual certificate holders cannot bring claims related to the certificate holders' investments in ABS because of "no-action" clauses that are typically found in Pooling and Servicing Agreements ("PSAs"). See Defs.' Joint Non-

---

[49] In their effort to overcome the statute of limitations bar, FFP plaintiffs grossly misinterpret the Circuit's ruling when they state: "The Second Circuit held that, even if California law were no different than other jurisdictions, Schwab could plausibly have relied on the BBA's false assurances." Pls.' Joint Non-PJ Br., at 9 (emphasis added). Nowhere in Schwab does the Circuit suggest that the BBA's false assurances could have resulted in a finding of justifiable reliance in any other state besides California.

47

PJ Br., at 15; see also Letter from Paul S. Mishkin to the Court, Feb. 19, 2019, ECF No. 2808.  But defendants rely on inapposite case law discussing how certificate holders cannot bring breach of representation and warranty claims; plaintiffs' claims, of course, sound in antitrust and fraud.  See, e.g., Deutsche Bank Nat'l Trust Co. v. Quicken Loans Inc., 810 F.3d 861, 868 n.8 (2d Cir. 2015).  Plaintiffs, for their part, assert that "no-action" clauses do not "extend to a security holder's common law and statutory claims." Letter from James Martin to the Court, Feb. 4, 2019, ECF No. 2791.

As the legal authorities on which plaintiffs rely make clear, the legal effect of a "no-action" clause depends on a fact-specific inquiry into the language of the particular "no-action" clause at issue.  See Quadrant Structured Prod. Co. v. Vertin, 23 N.Y.3d 549, 564-65 (2014) (discussing cases in which federal courts analyze different "no-action" clauses and finding that the scope of legal claims that security holders are allowed to bring depends on the language of each "no-action" clause).

We cannot determine whether the NCUA and FFP plaintiffs can bring antitrust and fraud claims without reviewing the "no-action" clauses contained in the PSAs of the asset-backed securities they purchased.  Therefore, we direct the NCUA and FFP plaintiffs to include representative samples of the "no-action" clauses in their amended complaints.  Defendants will then have an opportunity, if appropriate, to move for dismissal of plaintiffs' claims.

<u>Principal's Amendments That Add Details of Swap Transactions</u>

Principal moves to add more details regarding their swap transactions with defendants. To the extent that Principal is simply providing more information about the transactions, we allow their amendments because we do not find that the amendments prejudice defendants in any way. See <u>Pasternack v. Shrader</u>, 863 F.3d 162, 174 (2d Cir. 2017). However, to the extent that Principal is adding more details to reassert claims that we have previously dismissed, we reject the proposed amendments. <u>See, e.g.</u>, Mem. & Order, 2016 WL 4773129, at *9 (S.D.N.Y. Sep. 12, 2016) (dismissing Principal's fraud and negligent misrepresentation claims against Credit Suisse International, Chase Bank USA, and Royal Bank of Scotland because Principal failed to allege swap agreements during the alleged suppression period).

<u>FDIC's Amendments Related to Previously Dismissed Claims</u>

Finally, the FDIC reasserts claims[50] that were already dismissed by the Court in <u>LIBOR IV</u>. At oral argument, the FDIC confirmed that it had included the dismissed claims in the proposed amended complaint for the sole purpose of preserving them for appeal, rendering it unnecessary to discuss them further.

---

[50] Defendants stated that the FDIC reasserts "claims for tortious interference with prospective economic advantage, breach of contract, and negligent misrepresentation." Joint Mem. Law in Supp. Defs.' Opp. Pls.' Mots. for Leave to Amend ("Defs.' Joint Non-PJ Br."), at 6, ECF No. 2625.

**IV. Defendants' Motion to Dismiss Against Schwab and Doral**

Defendants move for partial dismissal of Schwab's and Doral's complaints for lack of personal jurisdiction[51] and for failure to state a claim. Since the same standards of review are used to evaluate motions for leave to amend and motions to dismiss, our jurisdictional analyses in the previous section also apply to Schwab's and Doral's claims; indeed, some of the jurisdictional issues presented in the motions for leave to amend appear in both Schwab's and Doral's complaints. This is especially true for Doral, whose complaint is substantially similar to the FDIC's proposed second amended complaint.

**1. General Legal Standard for Motion to Dismiss**

As we have already described the general standards applicable to motions to dismiss in the context of evaluating the motions for leave to amend, see supra Part III.1, we discuss only the standards that are specific to the instant motions.

When deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), we must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009). Nevertheless, the plaintiff's "[f]actual allegations must

---

[51] Defendants also move to dismiss Doral's antitrust claims against certain defendants for improper venue under Rule 12(b)(3). Since we find that the FDIC fails to establish conspiracy jurisdiction, see supra Part III.2.4, we need not reach defendants' argument regarding lack of venue under the Clayton Act.

be enough to raise a right to relief above the speculative level."
Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The well-
pleaded allegations must show "more than a sheer possibility that
a defendant has acted unlawfully" to pass muster.  Ashcroft v.
Iqbal, 556 U.S. 662, 678 (2009).  If the plaintiff has "not nudged
[its] claims across the line from conceivable to plausible, [the]
complaint must be dismissed."  Twombly, 550 U.S. at 570.

When a defendant in a federal securities claim brought under
the Exchange Act challenges the exercise of personal jurisdiction,
the challenge "must be tested against due process standards."
S.E.C. v. Unifund SAL, 910 F.2d 1028, 1033 (2d Cir. 1990).  The
due process test has two related components: the "minimum contacts"
inquiry and the "reasonableness" inquiry.  Metro. Life Ins. Co. v.
Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996).  When
conducting a "minimum contacts" inquiry in a federal securities
action, a court looks at the defendant's contacts with the entire
United States.  S.E.C. v. Straub, 921 F. Supp. 2d 244, 253
(S.D.N.Y. 2013).  If sufficient contacts are found, the court may
exercise jurisdiction so long as "it is reasonable [to do so] under
the circumstances of the particular case."[52]  Id.

---

[52] However, the "reasonableness" inquiry rarely defeats jurisdiction where
a defendant has sufficient contact with the forum.  See Asahi Metal Indus. Co.
v. Super. Ct. of Cal., Solano Cty., 480 U.S. 102, 116 (1987) (Brennan, J.,
concurring) (noting that only in "rare cases" will the inquiry defeat
jurisdiction).  In addition, the inquiry is "largely academic in non-diversity
cases brought under a federal law which provides for nationwide service of
process." S.E.C. v. Softpoint, Inc., No. 95-cv-2951 (GEL), 2001 WL 43611, at *5
(S.D.N.Y. Jan. 18, 2001).

### 2. Motion to Dismiss Schwab's Claims Based on Lack of Personal Jurisdiction

Schwab asserts federal securities claims premised on its purchase of floating-rate notes.[53] Specifically, Schwab asserts: (1) claims under Section 10(b) of the Securities Exchange Act of 1934[54] and SEC Rule 10b-5[55] ("10(b) claims") against Counterparty defendants who issued and/or sold floating-rate notes to Schwab, see Schwab SAC ¶¶ 186-87; (2) 10(b) claims against Non-Counterparty defendants based on their false LIBOR submissions, see id. ¶ 185; and (3) claims under Section 20(a) of the Exchange Act[56] ("20(a) claims") against the parent entities of 10(b) defendants through a control person theory, id. ¶ 195. Under California law, Schwab asserts: (1) fraud claims and breach of the implied covenant of good faith and fair dealing claims against Counterparty defendants who issued floating-rate notes, id. ¶¶ 200, 204; (2) unjust enrichment claims against Counterparty defendants who issued floating-rate or fixed-rate notes, id. ¶¶ 206-209; (3) fraud (and aiding and abetting fraud) claims against Non-Counterparty defendants based on their false LIBOR submissions,[57] id. ¶ 201; and

---

[53] Schwab no longer asserts its federal securities claims concerning fixed-rate notes in light of the Second Circuit's affirmance of our decision to dismiss the claims. See Schwab, 883 F.3d at 95-96.

[54] § 10(b), 15 U.S.C. § 78j(b) (2012).

[55] 17 C.F.R. § 240.10b-5 (2014).

[56] § 20(a), 15 U.S.C. § 78t(a) (2012).

[57] In light of our ruling that "a plaintiff may not sue its own counterparty for fraud on the basis of false LIBOR submissions," LIBOR IV, 2015 WL 6243526, at *62 n.92, Schwab "limits these claims to its purchases of floating-rate notes issued by Bank Affiliates, Parent Company Defendants, or non-Defendants." Schwab SAC ¶ 201.

(4) tortious interference claims against certain Non-Counterparty defendants whose affiliates issued floating-rate notes, id. ¶¶ 210–212.[58]

Schwab argues that we should exercise personal jurisdiction over defendants for all of its claims. While we previously considered whether personal jurisdiction could be established over defendants in Schwab's state law claims, we had no occasion to make specific rulings on jurisdiction in the context of the federal securities laws. However, a number of our earlier jurisdictional rulings are applicable to Schwab's federal securities claims.

In LIBOR IV, we found that personal jurisdiction could be established over a defendant for a claim arising from a federal statute with a nationwide service of process provision, such as the Exchange Act, if the defendant had sufficient contacts with the United States. 2015 WL 6243526, at *23. For Counterparty defendants who issued bonds, we upheld jurisdiction "where the bond was issued," or more specifically, "where the bond was placed with an underwriter or agent for sale or marketing." Id. at *37. We also upheld jurisdiction where Counterparty defendants directly solicited and sold LIBOR-linked financial instruments. March 31, 2016 Order, 2016 WL 1301175, at *4; see also Schwab, 883 F.3d at 83. But entities that were merely involved in the sale of LIBOR-

_____

[58] Schwab also asserts that, under the theory of civil conspiracy, each defendant "is being sued both individually as a primary violator of the law . . . and as a co-conspirator as provided for under state law." Schwab SAC ¶ 217.

based financial instruments - such as brokers, dealers, and agents - had no duty to disclose the alleged manipulation of LIBOR and could not be held liable for issuing defendants' failure to disclose the alleged manipulation. See LIBOR IV, WL 6243526, at *75. Synthesizing those rulings in the context of Schwab's Exchange Act claims, we can exercise personal jurisdiction over a Counterparty defendant who had sufficient contacts with the United States by issuing notes in the United States or placing them with a U.S.-based agent for sale.[59]

We have repeatedly found that, unless there is a plausible allegation that LIBOR submissions were made in the United States, we would exercise personal jurisdiction only over Counterparty defendants who: (1) transacted directly with plaintiffs by issuing LIBOR-based instruments and/or engaging in a "course of dealing" in the relevant forums; or (2) transacted indirectly with plaintiffs through their subsidiaries or affiliates. See supra Part III.2. As defendants argue in their briefs, Schwab attempts to broaden the jurisdictional scope of its claims to include Non-Counterparty defendants in spite of our prior rulings and the Second Circuit's affirmance of those rulings. For the reasons stated below, we reject Schwab's assertion that we should exercise personal jurisdiction over Non-Counterparty defendants.

---

[59] This exercise of jurisdiction is in line with the Supreme Court's ruling in Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975), that a private cause of action under § 10(b) is limited to purchasers or sellers of securities.

### 2.1. Nationwide General Jurisdiction Based on the Exchange Act's Nationwide Service of Process

Under a novel theory of nationwide general jurisdiction, Schwab asserts that the nationwide service of process provision of the Exchange Act establishes <u>federal general jurisdiction</u> over all defendants who are domiciled in the United States.[60]  <u>See</u> Schwab's Opp'n to Defs.' Mot. Dismiss ("Schwab Br."), at 11-13, ECF No. 2668.  Schwab argues that a defendant's residency in the United States creates "minimal contacts" with the United States and can justify the federal government's exercise of <u>general jurisdiction</u>.  <u>See</u> <u>id.</u> at 11 (quoting <u>Mariash v. Morrill</u>, 496 F.2d 1138, 1143 (2d Cir. 1974)).  In response, defendants contend that Schwab "improperly conflates" the analysis for general jurisdiction in a specific state with the sufficiency of a defendant's residency in the United States for purposes of establishing <u>specific jurisdiction</u> in federal securities claims.  <u>See</u> Defs.' Joint PJ Br., at 46.

We agree with defendants.  In <u>LIBOR IV</u>, we held that, in evaluating the existence of personal jurisdiction for federal claims arising from statutes with nationwide service of process provisions, we would make a "<u>minimum contacts</u>" inquiry and examine a defendant's suit-related contact with the entire United States,

---

[60] They include: (1) Bank of America, N.A., Citibank, N.A., and JP Morgan Chase Bank, N.A., who Schwab refers to as "Domestic Panel Bank" defendants; and (2) Bank of America Corp., Citigroup Inc., and JP Morgan Chase & Co., who Schwab refers to as "Domestic Parent Company" defendants.  <u>See</u> Schwab SAC ¶ 220.

rather than just the forum state. See 2015 WL 6243526, at *23. We also held that, under the Supreme Court's rulings in Daimler and Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915 (2011), we would examine a defendant's "continuous and systematic" contacts with the forum state in evaluating general jurisdiction in that state. Id. at *25-27; see also Metro. Life, 84 F.3d at 568 ("Because general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's continuous and systematic general business contacts." (internal citation omitted)). Therefore, "[g]eneral jurisdiction and specific jurisdiction require different legal analyses . . . and the question of minimum contacts only applies in a specific jurisdiction analysis." Mem. & Order, 2017 WL 532465, at *1 (S.D.N.Y. Feb. 2, 2017), ECF No. 1761.

At oral argument, Schwab argued that, applying a theory of federal general jurisdiction predicated on the Exchange Act's nationwide service of process provision, this Court could exercise jurisdiction over Non-Counterparty defendants for state law claims. See Tr. 4:12-18. According to Schwab, finding federal general jurisdiction based on a defendant's U.S. residency has been "Second Circuit law for about 45 years" since the Circuit's decision in Mariash, 496 F.2d 1138. Id. But Schwab grossly misinterprets Mariash. In that case, the Circuit considered

56

whether a defendant's residency in the United States was sufficient to establish personal jurisdiction over the defendant for claims brought under the Exchange Act. Although the <u>Mariash</u> court did not explicitly state whether that jurisdiction was specific or general, its analysis of the defendant's "minimal contacts" indicates that <u>specific jurisdiction</u> was at issue. <u>See</u> 496 F.2d at 1143. In other words, the Circuit examined whether the defendant's residency in the United States created "minimal contacts" that would allow <u>specific jurisdiction</u> over the defendant for an Exchange Act claim.

Schwab also points to <u>Porina v. Marward Shipping Co.</u>, 521 F.3d 122 (2d Cir. 2008), in which the Circuit considered the question of whether a foreign defendant's contacts with the United States were sufficiently "continuous and systematic" to establish nationwide general jurisdiction. The defendant in <u>Porina</u> had insufficient contacts with any specific state, so the plaintiffs relied on Rule 4(k)(2), which allows a federal court to exercise personal jurisdiction when the defendant is not "subject to jurisdiction in any state's courts of general jurisdiction."[61] Fed. R. Civ. P. 4(k)(2)(A). This rule was "specifically designed

---

[61] Rule 4(k)(2) allows a federal court to exercise personal jurisdiction when three requirements are met: "(1) the claim must arise under federal law; (2) the defendant must not be subject to jurisdiction in any state's courts of general jurisdiction; and (3) the exercise of jurisdiction must be consistent with the United States Constitution and laws." <u>Porina</u>, 521 F.3d at 127 (internal quotation marks omitted).

to 'correct[] a gap' in the enforcement of federal law in international cases," Porina, 521 F.3d at 126 (alternation in original) (quoting Fed. R. Civ. P. 4 advisory committee's note, 1993 Amendments), which "arose from the general rule that a federal district court's personal jurisdiction extends only as far as that of a state court in the state where the federal court sits," id. Consequently, a federal court could not exercise jurisdiction over a foreign defendant that had sufficient contact with the United States but not with any single state. Thus, the Circuit's analysis of the foreign defendant's "continuous and systematic general business contacts" with the United States in Porina has no bearing on Schwab's argument because Schwab cannot rely on Rule 4(k)(2): defendants over which Schwab attempts to establish nationwide general jurisdiction are domestic entities who are subject to general jurisdiction in their home states.

Other cases on which Schwab relies do not support its novel theory. Rather, the cases answer affirmatively the question of whether a defendant in a federal securities lawsuit could be subject to specific jurisdiction in any federal court based on the defendant's U.S. residency.[62] See, e.g., Moon Joo Yu v. Premiere Power LLC, No. 14-cv-7588 (KPF), 2015 WL 4629495, at *5 (S.D.N.Y.

---

[62] None of the cases even mentions general jurisdiction or engages in an analysis of whether a defendant's contacts with the United States are sufficiently "continuous and systematic" to subject them to general jurisdiction.

Aug. 4, 2015) (holding that a New York federal court could exercise jurisdiction over a defendant for Exchange Act claims even though the defendant was a resident of Oklahoma).

For these reasons, we reject Schwab's attempt to establish jurisdiction over Non-Counterparty defendants under the theory of nationwide general jurisdiction.

## 2.2. Specific Jurisdiction over Defendants in Exchange Act Claims

Schwab plausibly alleges that Floating-Rate Issuer defendants[63] had sufficient contacts with the United States by issuing notes in the United States or placing them with U.S.-based agents for sale. <u>See</u> Schwab SAC ¶¶ 162-65, 168, 224-28. Therefore, consistent with our prior rulings, we exercise specific jurisdiction over Floating-Rate Issuer defendants.[64]

However, for some notes that were issued by foreign defendants, Schwab does not sufficiently allege that they were

---

[63] Schwab brings various claims against defendants who issued floating-rate notes and refers to these defendants as "Floating-Rate Issuer Defendants" in its complaint. We adopt Schwab's labeling, which includes domestic banks (Bank of America, Citigroup Inc., JPMorgan Chase Bank, and JPMorgan Chase & Co.) and foreign banks (Barclays Bank plc, Credit Suisse AG, Deutsche Bank AG, Rabobank, Royal Bank of Canada, The Royal Bank of Scotland plc, and UBS AG).

[64] According to defendants, Schwab fails to plausibly allege personal jurisdiction based on the place of issuance because Schwab does not identify the exact location within the United States where notes were issued. Joint Reply Mem. of Law in Further Support of Defs.' Mot. Dismiss for Lack of Personal Jurisdiction and Venue ("Defs.' Joint MTD PJ Reply"), ECF No. 2701, at 12-13. However, in evaluating whether we can exercise personal jurisdiction over a defendant in a federal securities claim, we examine the defendant's contact with the entire United States. Therefore, Schwab does not need to allege the exact locations in which defendants issued their notes; rather, Schwab only needs to allege that defendants issued floating-rate notes in the United States or placed them with U.S.-based agents for sale.

issued or placed with an agent for sale in the United States.  See, e.g., id. at ¶ 163 n.187 & n.188 (noting that transactions numbered FL925-26 do not have agent information).  Schwab argues that any ambiguity as to whether the seller was located in the United States should be resolved in its favor at the pleading stage.[65]  But we may not "draw argumentative inferences in the plaintiff's favor." Overseas Military Sales, 21 F.3d at 507 (internal quotation marks omitted).  Without any specific allegation about the identity or location of the defendant's agent, we cannot draw the requested inferences in Schwab's favor, especially since Schwab has had more than seven years to review its transaction data.

Schwab contends that, even if the selling agent information is missing, we can still exercise jurisdiction over defendants for Exchange Act claims that are premised on the notes at issue because foreign Floating-Rate Issuer defendants delivered the notes "into the stream of commerce with the expectation that they would be purchased by investors in the United States."[66]  Schwab Br., at 15 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 298 (1990)).  However, floating-rate notes "may arrive in the hands of plaintiffs and other investors anywhere in the world by the

_____

[65] At oral argument, Schwab stated that "many [notes] were purchased at issuance by the Schwab investment people in San Francisco" in the primary market.  Tr. 7:19-25.  Since Schwab cannot represent that it purchased all of its notes at issuance, we cannot reasonably infer that the notes without adequate seller information were issued or placed for sale in the United States.

[66] To the extent that Schwab relies on the "foreseeability" theory (i.e., it was foreseeable that the notes would arrive in the United States), we reject it.  See LIBOR IV, WL 6243526, at *31; see also Schwab, 883 F.3d at 87-88.

investors' own trades – not at the direction of the issuers. Such a fortuitous, plaintiff-driven contact cannot support personal jurisdiction." <u>LIBOR IV</u>, 2015 WL 6243526, at *31; <u>see also</u> <u>Volkswagen</u>, 444 U.S. at 298 (1990) ("[T]he mere unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.").

Therefore, in addition to domestic defendants who issued notes in the United States, we exercise specific jurisdiction over foreign Floating-Rate Issuer defendants who Schwab sufficiently alleges issued notes or placed them for sale in the United States.

### Jurisdiction Based on the Sale of Floating-Rate Notes

Schwab also asserts claims against five Panel Bank defendants[67] for selling Schwab floating-rate notes that were issued by either themselves or others. <u>See</u> Schwab SAC ¶¶ 160-61, 165, 170, 172, 187. Relying on <u>Schwab</u>, Schwab argues that we must exercise jurisdiction over the five defendants based on their direct sales to Schwab. <u>See</u> 883 F.3d at 82 ("Allegations of billions of dollars in transactions in California easily make out a prima facie showing of personal jurisdiction for claims <u>relating to those transactions</u>." (emphasis added)).

Defendants correctly point out that, in making this argument, Schwab ignores our prior rulings and other binding authorities.

---

[67] The defendants are Bank of America, N.A., Deutsche Bank AG, JPMorgan Chase Bank, N.A., Royal Bank of Canada, and The Royal Bank of Scotland plc.

Generally, there can be no material omission under § 10(b) absent a duty to disclose.[68] See, e.g., Basic v. Levinson, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); Chiarella v. United States, 445 U.S. 222, 235 (1980) ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak."). As we held in LIBOR IV, entities that were merely involved in the sale of LIBOR-based financial instruments "had no duty under contract law to advise sophisticated investors of LIBOR-related risks, no duty to deal at any particular price, and no ongoing duties of good faith after concluding a sale on bargained-for terms." 2015 WL 6243526, at *75. Therefore, we do not exercise specific jurisdiction over defendants who were merely involved in the sale of floating-rate notes to Schwab.[69]

Jurisdiction Based on False LIBOR Submissions

Schwab also asserts that we should exercise jurisdiction over Non-Counterparty defendants for their allegedly false LIBOR submissions in furtherance of the conspiracy, reasoning that there is "at least a 'but for' connection between the sale of floating-

---

[68] Whether a selling entity had a duty to disclose may be an issue of merits, not of jurisdiction. However, since defendants raise the issue as one of jurisdiction, see Defs.' Joint MTD PJ Reply, at 13-15, we address it here.

[69] We still exercise specific jurisdiction over four of the five Panel Bank defendants (Bank of America, N.A., Deutsche Bank AG, Royal Bank of Canada, and The Royal Bank of Scotland plc) based on Schwab's allegations that they issued notes in the United States or placed notes for sale with U.S.-based agents.

rate notes to Schwab . . . and Section 10(b) claims against all Defendants based on their false LIBOR quotes." Schwab Br., at 17.

As a threshold matter, a private cause of action under Section 10(b) of the Exchange Act is limited to "actual . . . sellers" of securities. Blue Chip Stamps, 421 U.S. at 731. Thus, Schwab cannot assert 10(b) claims against Non-Counterparty defendants. In addition, as defendants point out, § 10(b) of the Exchange Act may not be the predicate of a conspiracy claim. See, e.g., Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin, 135 F.3d 837, 841 (2d Cir. 1998). Even if such a cause of action existed under the Exchange Act, the Second Circuit held that the alleged conspiracy to manipulate LIBOR "had nothing to do with the California transactions." See Schwab, 883 F.3d at 87. Furthermore, we have repeatedly rejected the assertion that defendants had sufficient contacts with the United States by transmitting LIBOR data to data vendors in the United States. See supra Part III.2.4. To the extent that Thomson Reuters had a role in the setting of all LIBOR benchmarks, it was a pre-existing one as a calculation agent of the BBA, who is neither a defendant nor a co-conspirator in this action.[70] See LIBOR VI, 2016 WL 7378980, at *10. Accordingly, we do not exercise specific jurisdiction

---

[70] The BBA's limited use of Thomson Reuters as its calculation agent simply does not change the fact that the setting of LIBOR rates for 10 currencies, including the U.S. Dollar, took place at 11:00 AM London time. See British Bankers' Ass'n, Understanding the Construction and Operation of BBA LIBOR – Strengthening for the Future, Jun. 10, 2008, § 9.1.

over Non-Counterparty defendants for Schwab's Exchange Act claims based on the allegations of false LIBOR submissions.

## 2.3. Pendent Jurisdiction over State Law Claims

As relevant here, the doctrine of pendent personal jurisdiction provides that "where a federal statute authorizes nationwide service of process, and the federal and state claims derive from a common nucleus of operative fact, the district court may assert personal jurisdiction over the parties to the related state law claims even if personal jurisdiction is not otherwise available." IUE AFL–CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1056 (2d Cir. 1993) (citation and internal quotation marks omitted). However, pendent jurisdiction "need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966). In determining whether pendent jurisdiction should be exercised, a federal court must consider "judicial economy, convenience and fairness to litigants." Id.

As discussed infra, see Part IV.3.2, all of Schwab's Exchange Act claims for which defendants were not dismissed for lack of personal jurisdiction survive defendants' motion to dismiss for failure to state a claim. And as we did in LIBOR IV, we exercise pendent personal jurisdiction over those defendants for state law claims deriving from "a common nucleus of operative fact" as

Schwab's surviving Exchange Act claims. See 2015 WL 6243526, at *24. Conversely, since we have dismissed Schwab's 10(b) claims that are based on allegedly false LIBOR submissions, we do not exercise pendent party jurisdiction over Non-Counterparty defendants for Schwab's fraud (and aiding and abetting) claims, which are based on the same factual predicate.[71]

Schwab urges a different outcome, arguing that we should exercise pendent party jurisdiction over Non-Counterparty defendants for its state law claims premised on false LIBOR submissions because those claims and its federal claims "substantially overlap." Schwab Br., at 19 (quoting Cohen v. Facebook, Inc., 252 F. Supp. 3d 140, 154 (E.D.N.Y. 2017)). However, Schwab's surviving Exchange Act claims are, as defendants point out, based on Floating-Rate Issuer defendants' failure to disclose the artificial suppression of LIBOR in their issuance of notes in the United States. Thus, all factual events underlying the federal claims took place in the United States, while allegedly false LIBOR submissions occurred in London.[72] Moreover, exercising

---

[71] As discussed infra, see Part IV.3.5, we dismiss Schwab's claims of tortious interference against certain Panel Bank defendants because the claims are time-barred and insufficiently pled. But even if the claims survived defendants' motion to dismiss, we would still decline to exercise pendent jurisdiction over defendants for those claims because they are based on those defendants' allegedly false LIBOR submissions to the BBA.

[72] Schwab asserts that we should exercise specific jurisdiction over Non-Counterparty defendants for state law claims under the conspiracy theory of jurisdiction. Even if California recognized conspiracy jurisdiction (which it does not, see supra note 29), Schwab fails to plausibly allege conspiracy jurisdiction because defendants' alleged acts, see Schwab SAC ¶¶ 257-64, are not overt acts in furtherance of the alleged conspiracy. See supra Part III.2.4.

pendent party jurisdiction over Non-Counterparty defendants, many of whom are foreign and had no contacts of their own with the United States, "would not comport with notions of fair play and substantial justice." Laydon v. Mizuho Bank, Ltd., No. 12-cv-3419 (GBD), 2015 WL 1515358, at *6 (S.D.N.Y. Mar. 31, 2015); see also Brown v. Lockheed Martin Corp., 814 F.3d 619, 625 (2d Cir. 2016).

Finally, as we noted in LIBOR IV, the Second Circuit "recognizes a version of pendent personal jurisdiction under which a federal court may 'entertain [state-law] claims that are not expressly covered by the long-arm statute, so long as they derive from the same nucleus of operative fact as claims that are.'" 2015 WL 6243526, at *23 n.40 (alteration in original) (quoting Hanly v. Powell Goldstein, L.L.P., 290 F. App'x 435, 438 (2d Cir. 2008)). "This judge-made exception to the general rule that a federal court must look to the law of the forum state to determine whether personal jurisdiction must lie," id. (citation and internal quotation marks omitted), may have bearing on Schwab's attempt to establish jurisdiction over some Indirect Counterparty defendants who "affirmatively directed notes for sale in California . . . through Bank Affiliates that acted as agents for the purpose of selling notes." Schwab SAC ¶ 245. But Schwab alleges that defendants designated the affiliates as their selling agents and provided offering materials that specified the affiliates' "authority and permissible activities with respect to the

offering." Id. ¶ 131. Since Schwab's allegations sufficiently show that the affiliates acted "for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal," Schwab, 883 F.3d at 85, we can (and do) exercise specific jurisdiction over Indirect Counterparty defendants based on their affiliates' activities. Thus, the consideration of the Second Circuit's rule is academic.

### 3. Motion to Dismiss Schwab's Claims Based for Failure to State a Claim

Defendants move to dismiss under Rule 12(b)(6) Schwab's federal claims and its state law claims for: (1) unjust enrichment premised on Schwab's purchase of fixed-rate notes; and (2) tortious interference with contracts. Only Schwab's 10(b) claims against Floating-Rate Issuer defendants survive the motion.[73]

### 3.1. Addition of New Defendants and Claims

We first address Schwab's amendments that identify: (1) Bank of Scotland plc, Credit Suisse AG, Lloyds Bank plc, and Royal Bank of Scotland plc as Panel Bank defendants, see, e.g., Schwab SAC ¶ 48 n.48 (citing Fed. R. Civ. P. 15(c)(1)); and (2) certain Indirect Counterparty defendants as both direct and indirect sellers of financial instruments, see, e.g., id. ¶ 161 (identifying Bank of

---

[73] The parties agree that Schwab's 10(b) claims exclude floating-rate instruments with maturities of less than nine months. See 15 U.S.C. § 78c(a)(10) (excluding from the definition of a "security" any note "which has a maturity at the time of issuance of not exceeding nine months").

America, N.A., Royal Bank of Canada, and Royal Bank of Scotland plc as having conducted "direct transactions" with Schwab).

In its previous complaints in this action, filed in April 2013 (ECF No. 1, 13-cv-7005 (NRB)) and October 2014 (ECF No. 672), Schwab incorrectly identified certain members of the LIBOR panel. For example, in its April 2013 complaint that was originally filed in California state court and removed to federal court, Schwab identified Credit Suisse Group AG (the parent company of the Credit Suisse entities) as a member of the LIBOR panel even though Credit Suisse AG is the entity that served on the panel. See April 2013 Compl., 13-cv-7005 (NRB), ECF No. 1-1, ¶¶ 39, 49. Schwab made similar mistakes with respect to three other entities. See id. ¶¶ 43 (identifying Lloyds Banking Group plc and HBOS plc as defendants), 46 (identifying The Royal Bank of Scotland Group plc as a defendant), 49 (identifying defendants as panel members).

Schwab moves to correct its mistakes by substituting for the erroneously named defendants their affiliated entities that actually served on the LIBOR panel during the relevant period.[74] Schwab asserts that it did not learn the true identities of the LIBOR Panel Banks until November 2014, when the banks' employee declarations, see ECF Nos. 767, 781, 784, identified the entities that served on the LIBOR panel. Defendants object to Schwab's

---

[74] Schwab removes the original defendants from those claims deriving from service on the LIBOR panel. However, Schwab continues to name the original defendants in its Section 20(a) and fraud claims as parent company defendants.

amendments and argue that Schwab attempts to impermissibly add new defendants.  See Joint Mem. of Law in Supp. of Defs.' Mot. for Partial Dismissal of Schwab and Doral Compls. For Failure to State a Claim ("Defs.' Joint MTD Br."), at 19-21, ECF No. 2623.

We accept Schwab's position that it merely seeks to correct its mistake concerning the proper identity of the relevant parties by now bringing its claims against defendants who "knew or should have known that [they] would have been named as . . . defendant[s] but for an error."  Krupski v. Costa Crociere S.p.A., 560 U.S. 538, 548 (2010); see also Datskow v. Teledyne, Inc., 899 F.2d 1298, 1302 (2d Cir. 1990) (holding that plaintiffs' complaint sufficiently alerted the erroneously named corporate defendant's affiliated entity that plaintiffs sought to sue it by including details concerning that entity).  In its original complaint, Schwab clearly indicated that it sought to bring its claims against the entities that served on the LIBOR panel, and thus those entities will not be "prejudiced in defending" themselves in the litigation. Fed. R. Civ. P. 15(c)(1)(C)(i).

Schwab also seeks to clarify that, based on its transaction data, certain Indirect Counterparty defendants sold notes both directly and indirectly to Schwab.  Though Schwab thus seeks to bring new claims against some of the original defendants based on transaction data that it had since the beginning of its lawsuit, the amendments would neither "require [defendants] to expend

69

significant additional resources to conduct discovery and prepare for trial" nor "significantly delay the resolution of the dispute." Pasternack v. Shrader, 863 F.3d 162, 174 (2d Cir. 2017) (internal quotation marks omitted).  Therefore, we allow the amendments.[75]

### 3.2. Exchange Act § 10(b) Claims

Defendants assert that we should dismiss Schwab's 10(b) claims because Schwab continues to fail to adequately plead loss causation.  See LIBOR IV, 2015 WL 6243526, at *70 (rejecting Schwab's theory that it suffered losses on floating-rate notes purchased and interest paid during the persistent suppression period because any downward distortion in the LIBOR rate would have been offset by a reduction in the price of the instrument).  As discussed in Part II of this opinion, Schwab vacated our dismissal of Schwab's 10(b) claims based on floating-rate notes.[76]  The Second Circuit reasoned that Schwab could have plausibly alleged two potential theories of loss causation: Schwab could have incurred losses if it "held a mispriced instrument to

---

[75] At oral argument, we asked defendants whether allowing these new claims would subject them to any prejudice "beyond potentially [rendering them] liable for additional damages."  Tr. 10:3-22.  Defendants simply stated that the amendments should not be allowed because they were not specifically "permitted by the mandate of the Second Circuit to this Court" in Schwab.  Id.  However, the Circuit's mandate did not preclude such amendments, and Rule 15(a) vests the Court with broad discretion to permit amendments "when justice so requires."

[76] The Second Circuit, however, upheld our rejection of Schwab's loss causation theory based on suppressed interest payments made during the persistent suppression period.  See Schwab, 883 F.3d at 93 ("We agree with the district court that to the extent that Schwab seeks to impose liability for false LIBOR submissions that affected the amount of money it received on instruments it had already purchased, its claims fail." (emphasis omitted)).

maturity" or "tried to sell [the instrument] after LIBOR manipulation was revealed." Schwab, 883 F.3d at 93. The Circuit instructed Schwab to add on remand "allegations clarifying the loss causation theory or theories on which it relied." Id.

In light of Schwab, we now find that Schwab has adequately clarified its theory and plausibly alleged loss causation. As the Circuit noted, Schwab's burden here is "not a heavy one." Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 187 (2d Cir. 2015). Schwab must simply give defendants "some indication" of the actual loss and "of a plausible causal link between the loss and the alleged fraud." Schwab, 883 F.3d at 93 (citation and internal quotation marks omitted). Schwab alleges that it held "virtually all"[77] of its floating-rate notes from issuance to maturity and that "each time a coupon payment was made, Schwab received less than it would have received absent Defendants' suppression of LIBOR." Schwab SAC ¶ 194. Applying the Circuit's rationale in Schwab, we find that these allegations plausibly provide a causal link between the alleged losses (i.e., lower amounts on coupon payments) and defendants' allegedly fraudulent manipulation of LIBOR.

---

[77] Schwab admits that it did not hold all of the notes to maturity. See Letter from Michael J. Miarmi to the Court, Feb. 12, 2019, ECF No. 2794. Whether Schwab held all of its notes to maturity is, defendants argue, "central to determining whether [Schwab] has stated a claim." See Letter from Alan C. Turner to the Court, Feb. 25, 2019, ECF No. 2821. However, the Second Circuit found that, "if Schwab tried to sell a floating-rate instrument after LIBOR manipulation was revealed, it might have been forced to sell at a loss." See Schwab, 883 F.3d at 93.

Defendants also move to dismiss Schwab's 10(b) claims that they argue are based on the purchase or sale of instruments that are not "securities" under the Exchange Act. See 15 U.S.C. § 78c(a)(10). The appendices that Schwab filed with its second amended complaint contain detailed information about the financial transactions that serve as the factual predicates of Schwab's claims. In one appendix, Schwab lists transactions involving "time certificates," see, e.g., Schwab SAC App'x A, at 95 (transactions numbered FL943-946), which Schwab alleges are floating-rate notes purchased from broker-dealers. Defendants contend that the "time certificates" are certificates of deposit that are insured by the FDIC and are "protected by the reserve, reporting, and inspection requirements of the federal banking laws." Marine Bank v. Weaver, 455 U.S. 551, 558 (1982). While such certificates would not constitute securities under Marine Bank, defendants fail to identify a single allegation in Schwab's complaint that suggests that the instruments are so regulated.[78] Accepting as true all factual allegations and drawing all reasonable inferences in Schwab's favor, we find it plausible that the instruments are widely offered securities that are not "abundantly protected under the federal banking laws." Id. at 559.

---

[78] As a matter of fact, Schwab, in response to our request at oral argument, submitted evidence that the instruments at issue were not regulated by the FDIC. See Letter from Michael J. Miarmi, Feb. 12, 2019, ECF No. 2794.

### 3.3. Exchange Act § 20(a) Claims

Schwab asserts 20(a) claims against the parent companies of the Panel Bank defendants that are the subject of the 10(b) claims.[79]  To establish a <u>prima facie</u> case under Section 20(a) of the Exchange Act, plaintiff must show: (1) "a primary violation by the controlled person"; (2) "control of the primary violator by the targeted defendant"; and (3) "that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." <u>S.E.C. v. First Jersey Sec., Inc.</u>, 101 F.3d 1450, 1472-73 (2d Cir. 1996) (internal quotation marks and alterations omitted).  As the parties recognize, "this Court has consistently sided with most judges in the District and found that <u>a plaintiff must plead culpable participation with scienter</u>." <u>In re ForceField Energy Inc. Sec. Litig.</u>, No. 15-cv-3020 (NRB), 2017 WL 1319802, at *16 (S.D.N.Y. Mar. 29, 2017) (emphasis added).  Therefore, to withstand a motion to dismiss a 20(a) claim, a plaintiff "must allege, at a minimum, particularized facts of the controlling person's conscious

---

[79] Schwab also brings a 20(a) claim against Barclays Bank plc for non-defendant Barclays Capital Inc.'s "violations of Section 10(b) in failing to disclose, in soliciting and selling floating-rate notes to Schwab, that LIBOR was suppressed."  Schwab SAC ¶ 198.  Since a broker or selling agent does not have a duty to disclose LIBOR manipulation, <u>see supra</u> Part IV.2.2, Schwab fails to allege any primary violation by Barclays Capital, and it therefore cannot establish control liability against Barclays Bank plc.  <u>See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 108 (2d Cir. 2007) (holding that control person liability could not be established when the plaintiff failed to allege any primary violation by the controlled entity).

misbehavior or recklessness." <u>In re MBIA, Inc., Sec. Litig.</u>, 700 F. Supp. 2d 566, 598 (S.D.N.Y. 2010).

In support of its 20(a) claims, Schwab advances two theories of control person liability. First, Schwab asserts that the parent company defendants are liable for their Panel Bank subsidiaries' alleged false LIBOR submissions to the BBA. <u>See</u> Schwab SAC ¶ 196. Second, Schwab argues that the parent company defendants are liable for their Panel Bank subsidiaries' failure to disclose the alleged LIBOR manipulation in their issuance of floating-rate notes. <u>Id.</u> ¶ 197. However, both theories fail because Schwab does not set forth any particularized factual allegation that demonstrates the parent company defendants' culpable participation.[80] Schwab merely alleges that each of the parent company defendants was "a culpable participant in the fraud" alleged in Schwab's complaint. Schwab SAC ¶ 483. Such a general and conclusory allegation of culpable participation cannot withstand defendants' motion.

Schwab misleadingly cites our prior ruling in <u>LIBOR IV</u> in support of its argument that it has sufficiently alleged the parent company defendants' culpable participation. In <u>LIBOR IV</u>, we found that, for fraud by omission in the course of offering or trading securities, it is sufficient for purposes of pleading scienter "to

---

[80] Since we have rejected Schwab's 10(b) claims premised on false LIBOR submissions to the BBA, the first theory also fails on the independent ground that Schwab has failed to plausibly allege a primary violation by Panel Bank defendants. <u>See</u> <u>ATSI</u>, 493 F.3d at 108.

state plausibly that defendants were either themselves manipulating LIBOR or that defendants were large banking institutions with access to nonpublic data about real inter-bank transactions." 2015 WL 6243526, at *58. Specifically, Schwab argues that, since the parent company defendants are large banking institutions who could have plausibly known of the manipulation "when LIBOR suppression became so widespread," id., Schwab asserts that it is "highly plausible that the Parent Company Defendants knew about or recklessly disregarded" the Panel Bank defendants' manipulation of LIBOR, Schwab Br., at 39. However, as defendants correctly point out, the ruling in LIBOR IV concerned whether a Counterparty defendant had a duty to disclose facts, such as suppressed LIBOR rates, that are "basic to the transaction and when the customs of the trade . . . would reasonably demand disclosure." See 2015 WL 6243526, at *57. We have never found that the parent companies knew about or participated in manipulating LIBOR, and Schwab does not allege particularized facts that demonstrate "a showing of both fraudulent conduct and a culpable state of mind" by the defendants. Steed Fin. LDC v. Nomura Sec. Int'l, Inc., No. 00-cv-8058 (NRB), 2001 WL 1111508, at *10 (S.D.N.Y. Sept. 20, 2001). Therefore, we dismiss Schwab's 20(a) claims against the parent company defendants.

### 3.4. Unjust Enrichment Claims[81]

In <u>LIBOR IV</u>, we dismissed Schwab's unjust enrichment claims mainly for lack of personal jurisdiction.[82]   In this motion, defendants argue that we should dismiss Schwab's unjust enrichment claims against defendants who issued fixed-rate notes because, based on the Circuit's affirmance of our dismissal of Schwab's Exchange Act and fraud claims[83] premised on fixed-rate notes, Schwab cannot and does not plausibly allege that it was harmed by the alleged LIBOR suppression on fixed-rate notes.[84]

---

[81] The parties agree that Schwab's unjust enrichment claims based on floating-rate notes are limited to the notes that were issued by Floating-Rate Issuer defendants.  However, defendants request that, since Schwab does not specifically state that it seeks to recover from defendants based only on their <u>issuance</u> of floating-rate notes (and not on their <u>sale</u> of floating-rate notes), we require Schwab to file a corrected complaint.  <u>See</u> Joint Reply Mem. of Law in Supp. of Defs.' Mot. for Partial Dismissal of Schwab and Doral Compls. for Failure to State a Claim ("Defs.' Joint MTD Reply"), at 9 n.10, ECF No. 2697. Since Schwab has confirmed that its unjust enrichment claims based on floating-rate notes are "limited to transactions in which those Defendants issued the notes," Schwab Br. 47 n.20, no correction is necessary.

[82] As discussed in Part II of this opinion, we also held that they were partially time-barred, <u>see</u> <u>LIBOR IV</u>, 2015 WL 6243526, at *177, but that ruling was vacated in <u>Schwab</u>, <u>see</u> 883 F.3d at 96-98.

[83] We dismissed the state law fraud claims because "plaintiffs who used LIBOR-based pricing to decide whether to invest in LIBOR-based instruments" were relying on the "fraud on the market" doctrine that was rejected under California law.  <u>LIBOR IV</u>, 2014 WL 6243526, at *65.  The Circuit found that, because Schwab's allegations went "beyond the bare assertion that Defendants' fraudulent LIBOR submissions were embedded in the price of fixed-rate instruments," we erred in finding that Schwab was relying on that doctrine. <u>Schwab</u>, 883 F.3d at 91.  The Circuit, however, affirmed our dismissal because defendants had no reason to expect that Schwab would consider LIBOR in deciding whether to buy fixed-rate notes, which did not reference LIBOR at all.  <u>Id.</u> at 91-92; <u>see also</u> <u>supra</u> Part II.

[84] The parties disagree as to: (1) whether Schwab asserted unjust enrichment claims based on fixed-rate notes in the first amended complaint; and (2) whether defendants waived their right to dismiss the claims under Rule 12(b)(6) by not raising the argument in their initial motion to dismiss.  Since Schwab alleged that it purchased both fixed-rate and floating-rate instruments, <u>see</u> Schwab's Amend. Compl., ECF No. 672, ¶¶ 5, 12, 270, and did not specify which instruments served as the basis for its unjust enrichment claims, we draw a reasonable inference in Schwab's favor and conclude that Schwab asserted unjust enrichment claims based on both fixed-rate and floating-rate notes.  We

Under California law, the legal elements of unjust enrichment are "receipt of a benefit and unjust retention of the benefit at the expense of another." Lectrodryer v. SeoulBank, 77 Cal. App. 4th 723, 726 (2000); see also First Nationwide Sav. v. Perry, 11 Cal. App. 4th 1657, 1662 (1992). "The term 'benefit' denotes any form of advantage." F.D.I.C. v. Dintino, 167 Cal. App. 4th 333, 346 (2008) (internal quotation marks omitted). The equitable remedy of restitution "is designed to restore the aggrieved party to his or her former position by return of the [benefit] or its equivalent in money." Id. (citation omitted).

Schwab conclusorily asserts that defendants who issued fixed-rate notes were unjustly enriched because the LIBOR suppression "caused Schwab to receive lower returns on those notes in exchange for the use of its money than if the suppression had not occurred." Schwab SAC ¶ 208. See also id. ¶ 139 ("[T]o the extent LIBOR was suppressed during the Relevant Period, the yield received on [fixed-rate notes] would have been correspondingly lower."). In making this claim, Schwab fails to understand that a yield rate on a bond is calculated based on its price and interest rate. The price fluctuates based on macroeconomic conditions and, unless defendants had a magical, unilateral power to control the world economy, they could not have manipulated the yield rates on fixed-

_____

also conclude that defendants did not waive their right to challenge Schwab's fixed-rate unjust enrichment claims. See Fed. R. Civ. P. 12(h)(2).

rate notes and received monetary benefits. Furthermore, as the Second Circuit found, Schwab "received exactly what it expected" when it purchased fixed-rate notes. <u>Schwab</u>, 883 F.3d at 96.

Schwab also asserts that suppressed LIBOR rates allowed the issuing defendants to "offer less interest in return for the use of Schwab's money." Schwab SAC ¶ 208. But there is no allegation that defendants either took LIBOR into consideration when setting interest rates on fixed-rate notes or suppressed LIBOR in order to set low interest rates on the notes. In fact, Schwab cannot link defendants' alleged profits from issuing fixed-rate notes to LIBOR manipulation because fixed-rate notes do not "reference or relate to Defendants' LIBOR submissions in any way." <u>Schwab</u>, 883 F.3d at 96. In other words, there is no causal connection between LIBOR manipulation and the profits that defendants allegedly reaped from Schwab.[85] Schwab even admits that using LIBOR as a reference point "to evaluate [the] credit and market risks" of investments was an independent decision made by investors; issuers do not quote fixed-rate instruments in terms of LIBOR. Schwab SAC ¶ 139-40.

---

[85] Schwab argues that, under California law, pleading unjust enrichment "at most requires alleging but-for caus[ation]." Schwab Br., at 47 (citing <u>Uzyel v. Kadisha</u>, 188 Cal. App. 4th 866, 892 (2010)). This is a gross misinterpretation of the <u>Uzyel</u> decision. The plaintiff in <u>Uzyel</u> brought a breach of trust suit against a trustee seeking a disgorgement of profits made through the alleged breach. The court found that the plaintiffs did not need to trace the misappropriated funds in the trust to the profit that the trustee gained by using the funds. Rather, the plaintiff could prevail on an unjust enrichment claim if the plaintiff could "establish a <u>sufficient causal relationship</u> between the wrongful conduct and the defendant's profits." <u>Uzyel</u>, 188 Cal. App. 4th at 892. The court did not hold that alleging but-for causation was sufficient to plead a plausible unjust enrichment claim.

Following Schwab's line of reasoning, anyone who decided to use LIBOR as a benchmark in comparing investment options – which would include virtually all investors in the world, since "LIBOR is a component or benchmark used in countless business dealings," Gelboim, 823 F.3d at 765 – would be able to bring suit against defendants. See Schwab, 883 F.3d at 92.

In sum, as Schwab fails to plausibly allege that Fixed-Rate Issuer defendants were unjustly enriched, we dismiss Schwab's unjust enrichment claims based on fixed-rate notes.

### 3.5. Tortious Interference Claims

Schwab previously asserted claims for tortious interference with prospective economic advantage, which we dismissed for lack of personal jurisdiction in LIBOR IV. Schwab now brings new tortious interference claims, this time on the ground that certain Panel Bank defendants[86] interfered with Schwab's contracts with the defendants' affiliated entities. Defendants argue that these new claims are both time-barred and meritless.

Federal Rule of Civil Procedure 15(c)(1)(B) permits an amendment to a complaint to relate back to the original pleading if "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading." Fed. R. Civ. P. 15(c)(1)(B).

---

[86] Schwab asserts these claims against Panel Bank defendants Bank of Tokyo Mitsubishi UFJ, Ltd., Citibank, N.A., HSBC Bank plc, JPMorgan Chase Bank, N.A., and The Royal Bank of Scotland plc.

As we have explained, "a viable tortious interference claim alleges that a panel bank entity intended to disrupt a specific contract." LIBOR IV, 2015 WL 6243526, at *148.  Yet Schwab made no allegations in its original and first amended complaints related to this unique factual predicate.  In fact, it failed to specify any contract with which defendants allegedly interfered.  Rather, Schwab alleged that Panel Bank defendants' manipulation of LIBOR interfered with an economic relationship between Schwab and unspecified "issuers and sellers of LIBOR-based financial instruments" "by defeating the parties' expectations that LIBOR would be set honestly and accurately and would provide a fair benchmark for [] LIBOR-based financial instruments."  April 2013 Compl. ¶¶ 346-47; Schwab's Amend. Compl. ¶¶ 336-37.  Even though both sets of claims concern the same underlying event (defendants' alleged manipulation of LIBOR) and ultimate result (Schwab's financial loss from receiving lower payments or overpaying for financial instruments), Schwab's new claims are based on a distinct set of contracts that were not specified or referenced in the original complaint.  See Nettis v. Levitt, 241 F.3d 186, 193 (2d Cir. 2001) (holding that the plaintiff's new claim did not relate back to his original complaint because the new claim, while stemming from the same event as the original claims, was based on "an entirely distinct set" of facts), overruled on other grounds by Slayton v. Am. Exp. Co., 460 F.3d 215 (2d Cir. 2006).

Therefore, we find that the new claims do not relate back to its original complaint under Rule 15. Accordingly, they are untimely.

Even if we assume _arguendo_ that Schwab's new claims relate back, they fail on the merits in any event. Under California law, Schwab must plead: "(1) a valid contract between [Schwab] and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." Pac. Gas & Elec. Co. v. Bear Stearns & Co., 791 P.2d 587, 589-90 (Cal. 1990) (en banc). In LIBOR IV, we allowed tortious interference claims to proceed as to bonds issued by corporate affiliates because it was "plausible that corporate affiliates are aware of each other's financing arrangements."[87] 2015 WL 6243526, at *84. Relying on that decision, Schwab conclusorily alleges without any factual specificity that the Panel Bank defendants "acted with the knowledge" that interference with Schwab's contractual relationships was "certain or substantially certain to result from" the manipulation of LIBOR. Schwab SAC ¶ 512-13. However, even assuming (without deciding) that such an allegation suffices to plead the "knowledge" element of a tortious interference claim, LIBOR IV predates the Second

---

[87] In addition, we held that plaintiffs "must ultimately prove that the issuing entity breached the implied covenant by assisting in the panel entity's LIBOR manipulation." LIBOR IV, 2015 WL 6243526, at *84.

Circuit's decisions in <u>Schwab</u>, in which the Circuit determined that "the conspiracy to manipulate LIBOR had nothing to do with" LIBOR-based financial transactions. 883 F.3d at 87. If the object of the pled conspiracy had nothing to do with LIBOR-based financial transactions, it is not plausible that the Panel Bank defendants' manipulation of LIBOR was an intentional act designed to induce their affiliates to breach or disrupt their contracts with Schwab. Because Schwab fails to plausibly allege at least one required element, we dismiss its new claims of tortious interference with contracts in their entirety.[88]

### 4. Motion to Dismiss Doral's Claims for Lack of Personal Jurisdiction

In Part III of this Memorandum and Order, we considered and mostly rejected the FDIC's proposed amendments related to personal jurisdiction, which are substantially similar to Doral's jurisdictional allegations. We do not repeat our rulings from Part III, though they apply here with equal force.[89] We do, however, address two jurisdictional issues that are specific to Doral's claims concerning swap transactions.

---

[88] Even if Schwab's new tortious interference claims were timely and meritorious, we would not exercise pendent jurisdiction over them because Schwab asserts the claims against Non-Counterparty defendants based on their allegedly false LIBOR submissions in London. <u>See</u> <u>supra</u> Part IV.2.3.

[89] We explicitly state that Doral's claims against Non-Counterparty defendants based on conspiracy jurisdiction are dismissed for lack of jurisdiction.

First, defendants argue that personal jurisdiction cannot be premised on Doral's swap transactions that occurred before the alleged LIBOR manipulation period. Defs.' Joint MTD PJ Reply, at 15 n.16. Since Doral does not explain how defendants can be held liable for transactions that were not induced by their allegedly fraudulent omissions, we reject its attempt to establish personal jurisdiction over defendants for claims based on swap transactions that occurred before the relevant time period.

Second, defendants challenge Doral's reliance on forum selection clauses in its swap agreements that submit parties "to the jurisdiction of the Courts of the State of New York," reasoning that such clauses do not include federal courts located in New York. See Beach v. Citigroup Alternative Investments LLC, No. 12-cv-7717 (PKC), 2014 WL 904650, at *8 (S.D.N.Y. Mar. 7, 2014) ("[A] majority of courts have held that 'the courts of' a state refers only to state courts, and not to state and federal courts."). Doral argues that Beach is inapposite because the forum selection clause at issue in Beach vested "exclusive" jurisdiction in the courts of the state, whereas the clauses at issue here do not require such exclusivity. Pls.' Joint PJ Br., at 5 n.5. However, the Beach court's analysis does not in any way turn on the issue of exclusivity. Rather, the court only considered the clause's use of the word "of," rather than "in." Beach, 2014 WL 904650, at *8 ("The word 'of' denotes the source of a court's authority and

is more than its mere location. The courts 'of' a state are courts whose authority derive[s] from that state's power."). Therefore, we agree with defendants and reject Doral's reliance on the forum selection clauses to establish jurisdiction in this forum.

## 5. Motion to Dismiss Doral's Claims for Failure to State a Claim

Doral asserts federal antitrust claims as well as numerous state law claims. Many of Doral's state law claims[90] are identical to the FDIC's claims that, as Doral acknowledges, were previously dismissed by this Court.[91] Therefore, we consider only the claims that Doral addresses in response to defendants' motion to dismiss for failure to state a claim.

### 5.1. Fraud, Tortious Interference, and Negligent Misrepresentation Claims

Defendants move to dismiss Doral's fraud, tortious interference, and negligent misrepresentation claims as untimely in whole or in part. See Defs.' Joint MTD Br., at 22. Specifically, defendants argue that Doral's negligent

---

[90] The claims include: fraud and negligent misrepresentation claims (and related aiding and abetting and civil conspiracy claims) based on allegedly false statements about LIBOR; fraud by omission claims against Non-Counterparty defendants; tortious interference with contract claims (and related aiding and abetting and civil conspiracy claims) that exceed the scope permitted under LIBOR IV, 2015 WL 6243526, at *84; tortious interference with prospective economic advantage claims (and related aiding and abetting and civil conspiracy claims); and a breach of the implied covenant of good faith and fair dealing claim against Credit Suisse International.

[91] At oral argument, the FDIC conceded that its proposed second amended complaint, which incorporates Doral's complaint, includes claims that have previously been dismissed by this Court for the sole purpose of preserving them for appeal. Tr. 34:16-25. Furthermore, the FDIC confirmed that it was not asserting the claims anew by adding Doral as one of the plaintiffs in its consolidated complaint.

misrepresentation claim is fully time-barred, while its fraud, tortious interference, and related aiding and abetting claims are time-barred insofar as they accrued on or before February 26, 2009.

The parties' dispute centers on the proper accrual date for Doral's claims.[92]  Relying on LIBOR V, in which we considered the timeliness of the claims asserted by the Government Development Bank for Puerto Rico (GDB), defendants argue that Doral, like GDB, was on inquiry notice of its state law claims no later than May 29, 2008.  See Defs.' Joint MTD Br., at 23-26.  Thus, Doral's claims accrued on May 29, 2008, and the one-year limitations period expired on May 29, 2009.  See Defs.' Joint MTD Reply, at 21-22. Doral claims that, since this Court found Puerto Rico to be a "weak inquiry notice" jurisdiction in which it would have taken one year for "a sophisticated investor to discover that he had been injured by the panel banks' LIBOR suppression," LIBOR IV, 2015 WL 6243526, at *135, Doral's claims did not accrue until May 29, 2009, and the

---

[92] The parties agree that Puerto Rico's one-year statute of limitations applies to Doral's tort claims.  See Pls.' Joint Non-PJ Br., at 12 (applying Puerto Rico's one-year statute of limitations); Defs.' Joint MTD Br., at 23 (same); see also Rodriguez-Suris, 123 F.3d at 13 ("The Puerto Rico statute of limitations for tort actions provides for a one-year limitation period that begins to run from 'the time the aggrieved person has knowledge of the injury.'" (quoting 31 P.R. Laws Ann. tit. 31, § 5298)).  The one-year statute of limitations also applies to Doral's aiding and abetting claims because the claims are "actions to demand civil liability."  See id.  In addition, as defendants correctly point out, Doral's implied covenant of good faith and fair dealing and unjust enrichment claims are subject to the one-year statute of limitations applicable to tort claims because the claims are not based on an alleged breach of an obligation that was agreed upon between Doral and defendants.  See Ramos Lozada v. Orientalist Rattan Furniture Inc., No. RE-88-67, 1992 WL 755597, at *10-11 (P.R. June 15, 1992).

one-year limitations period did not expire until May 29, 2010. See Pls.' Joint Non-PJ Br., at 12.

Doral's premise that we found Puerto Rico to be a "weak inquiry notice" jurisdiction is simply incorrect. Rather, in LIBOR IV, we simply assumed (without deciding) "in the absence of specific contrary briefing on the discovery rules of each bank's home state . . . that each of the remaining jurisdictions [including Puerto Rico] would also apply the plaintiff-friendly 'weak inquiry notice' rule." 2015 WL 6243526, at *167. We made the same assumption in LIBOR V because GDB's claims were time-barred even under the "weak inquiry notice" rule. 2015 WL 6696407, at *12. However, after reviewing applicable precedents, we now find that Puerto Rico has a "strong inquiry notice" rule, under which the statute of limitations begins to run on the inquiry notice date. See, e.g., Arturet-Velez v. R.J. Reynolds Tobacco Co., 429 F.3d 10, 14 (1st Cir. 2005) (holding that, under Puerto Rico law, the running of the one-year statute of limitations for tort actions "does not require actual knowledge; it is enough that the would-be plaintiff had notice that would have led a reasonable person to investigate and so uncover the needed information"); see also Rodriguez-Suris, 123 F.3d at 16.[93]

---

[93] The one-year statute of limitations may be tolled by: "(1) judicial proceedings, (2) extra-judicial claims, and (3) acknowledgment of the debt by the person liable." Bryan v. Wal-Mart Puerto Rico, Inc., 951 F. Supp. 2d 236, 240 (D.P.R. 2013). However, "tolling acts must be interpreted restrictively

In addition to making an erroneous argument that Puerto Rico is a "weak inquiry notice" jurisdiction, Doral asserts that it was not on inquiry notice until October 2011, the proposed extended date of the alleged conspiracy's termination based on the 2017 Société Générale regulatory disclosures. Apart from our rejection of FFP plaintiffs' attempt to expand the time period of the alleged conspiracy based on the same regulatory disclosures, <u>see</u> <u>supra</u> Part III.3.3, we do not see any connection between inquiry notice and the length of the alleged conspiracy. Thus, we see no reason to change our <u>LIBOR V</u> ruling that financial institutions holding LIBOR-based instruments in Puerto Rico, such as Doral, were on inquiry notice by May 29, 2008, because they had "every reason to follow news about LIBOR." 2015 WL 6696407, at *12. Accordingly, any claim that is based on defendants' conduct on or before May 29, 2008, expired on May 29, 2009.

Since Doral's claims are brought by the FDIC, they implicate the FDIC's extender statute, 12 U.S.C. § 1821(d)(14) (2013), which contains a provision that revives any tort claim[94] for which the limitations period expired within five years of the FDIC's appointment. <u>See</u> 2015 WL 6243526, at *121. Therefore, Doral's

---

against the party invoking their protection." <u>Rodríguez Narváez v. Nazario</u>, 895 F.2d 38, 45 (1st Cir. 1990).

[94] The provision defines a tort claim as "a claim arising from fraud, intentional misconduct resulting in unjust enrichment, or intentional misconduct resulting in substantial loss to the institution." 12 U.S.C § 1821(d)(14)(C)(ii).

fraud, tortious interference, and related aiding and abetting claims are revived to the extent that the limitations period expired within five years of February 27, 2015, the date that the FDIC was appointed as receiver. See Doral Compl. ¶ 15. Applying the one-year statute of limitations for fraud claims, we find that any fraud or tortious interference claim based on defendants' conduct on or before February 26, 2009 are time-barred.[95] Since the provision does not apply to negligent misrepresentation claims, see LIBOR IV, 2015 WL 6243526, at *121, and Doral alleges misconduct occurring from August 2007 to May 2010, Doral's negligent misrepresentation claim should have been brought by May 2011 at the latest and is thus fully time-barred.

### 5.2. Donnelly Act Claim

Although Doral has no presence in New York, it asserts a state antitrust claim[96] against defendants under the Donnelly Act, which prohibits agreements for monopoly or in restraint of trade "in the conduct of any business, trade or commerce or in the furnishing of any service" in New York. N.Y. Gen. Bus. Law § 340(1).

---

[95] Thus, Doral's claims based on defendants' conduct on or before the inquiry notice date cannot be revived because they expired on May 29, 2009, which is before February 27, 2010.

[96] Doral asserts that we upheld the FDIC's Donnelly claims in LIBOR VI. See Pls.' Joint Non-PJ Br., at 18. Doral's reading of LIBOR VI is deeply flawed. We found that the same analytical framework could be used to assess both Sherman Act and Donnelly Act claims, see LIBOR VI, 2016 WL 7378980, at *24, but we never considered the merits of the FDIC's Donnelly claims. As a matter of fact, we found that defendants had "properly preserved their request to move for dismissal on other bases," which we now consider. Id. at *1.

Defendants argue that we should dismiss the claim based on federal preemption grounds. The New York Court of Appeals has not specifically determined when the Sherman Act preempts the Donnelly Act. See Conergy AG v. MEMC Elec. Materials, Inc., 651 F. Supp. 2d 51, 58 (S.D.N.Y. 2009). But lower courts in New York have found that "[w]here the conduct complained of principally affects interstate commerce, with little or no impact on local or intrastate commerce, it is clear that Federal antitrust laws operate to preempt the field." Two Queens, Inc. v. Scoza, 745 N.Y.S.2d 517, 519 (1st Dep't 2002). And federal courts have similarly recognized that a viable Donnelly Act claim requires "an impact on intrastate commerce so as to avoid a dormant Commerce Clause issue." In re Digital Music Antitrust Litig., 812 F. Supp. 2d 390, 416 (S.D.N.Y. 2011).

Doral argues that its complaint is "replete with (presumptively true) allegations that show [a] sufficient impact on local or intrastate commerce." Pls.' Joint Non-PJ Br., at 19. However, none of Doral's allegations makes the requisite showing. The allegations of defendants' transactions of LIBOR-based instruments, transmission of individual LIBOR submissions, and acts of concealment have nothing to do with the pled conspiracy. See supra Part III.2.4. Nor do the allegations that defendants owned property in New York and acceded to New York choice of law and forum selection clauses lend any support to Doral's argument.

See, e.g., H-Quotient, Inc. v. Knight Trading Grp., Inc., No. 03-cv-5889 (DAB), 2005 WL 323750, at *5 (S.D.N.Y. Feb. 9, 2005) (holding that plaintiffs' allegation that defendants' principal places of business were in New York was not sufficient to establish an impact on intrastate commerce); Conergy, 651 F. Supp. 2d at 61 (holding that choice of law and forum selection clauses do not demonstrate an impact on intrastate commerce).

Since Doral fails to plausibly allege that defendants' conduct had a sufficient impact on New York commerce, we dismiss its Donnelly Act claim.

### 5.3. Sherman Act Claims

Defendants move to dismiss Doral's Sherman Act claims that are based on: (1) transactions with non-defendant third parties as Counterparties; (2) transactions with Panel Bank defendants' subsidiaries and affiliates (i.e., instruments issued by the subsidiaries and affiliates); and (3) transactions in which Doral purchased instruments issued by Panel Bank defendants and sold by their subsidiaries and affiliates. Based on our LIBOR VI decision, we dismiss Doral's claims based on transactions with non-defendant third parties. Furthermore, as discussed in Part V, we dismiss antitrust claims based on instruments issued by Panel Banks' subsidiaries and affiliates, and we circumscribe claims based on instruments issued by Panel Bank defendants and sold by their subsidiaries and affiliates.

90

## V. Defendants' Motion for Judgment on the Pleadings

Bank of America, N.A. and JPMorgan Chase Bank, N.A. - the only remaining Panel Bank defendants in OTC plaintiffs' antitrust claims after our LIBOR VII decision[97] - move for partial judgment on the pleadings under the Federal Rule of Civil Procedure 12(c) as to OTC plaintiffs' claims that are based on transactions with Panel Banks' subsidiaries or affiliates.

In LIBOR VI, we employed, consistent with Gelboim, the four-factor analysis outlined by the Supreme Court in Associated General Contractors of California, Inc. v. California State Council of Carpenters ("AGC"), 459 U.S. 519, 540-45 (1983), for determining whether a plaintiff has antitrust standing.[98] After conducting a highly fact-specific inquiry, we drew "a line between plaintiffs who transacted directly with defendants and those who did not," LIBOR VI, 2016 WL 7378980, at *16, and found that plaintiffs who

---

[97] In LIBOR VI, we granted defendants' motion to dismiss certain defendants for lack of personal jurisdiction as to antitrust claims. The only remaining defendants after LIBOR VI with respect to OTC plaintiffs' antitrust claims were: Bank of America Corp.; Bank of America, N.A.; Citigroup, Inc.; Citibank, N.A.; JPMorgan Chase & Co.; and JPMorgan Chase Bank, N.A. See 2016 WL 7378980, at app. In LIBOR VII, we certified a class limited to OTC plaintiffs' antitrust claims against Bank of America, JPMorgan Chase, and their parent entities because Citibank, N.A. and Citigroup, Inc. had reached a settlement with OTC plaintiffs. See 299 F. Supp. 3d at 582, 607. After LIBOR VII, Bank of America and JPMorgan Chase filed a motion for leave to appeal under Rule 23(f), which the Second Circuit denied. See In re LIBOR-Based Fin. Instruments Antitrust Litig., No. 18-728, Doc. No. 84 (2d Cir. Nov. 6, 2018).

[98] "The four efficient enforcer factors are: (1) the directness or indirectness of the asserted injury, which requires evaluation of the chain of causation linking appellants' asserted injury and the Banks' alleged price-fixing; (2) the existence of more direct victims of the alleged conspiracy; (3) the extent to which appellants' damages claim is highly speculative; and (4) the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." Gelboim, 823 F.3d at 778 (citation and internal quotation marks omitted).

transacted with third party banks did not satisfy the first factor ("directness or indirectness of the asserted injury") of the AGC analysis. We reasoned that defendants could not be held liable for an independent decision by a plaintiff and a third party to incorporate LIBOR into financial transactions because the decision "breaks the chain of causation between defendants' actions and a plaintiff's injury." Id.

However, LIBOR VI did not resolve the question of whether a plaintiff "who transacted with a subsidiary or affiliate of a panel bank" could be considered as an efficient enforcer. Id. at *16 n.25. We reserved our ruling on that question and instructed the parties to consider it "at the class certification stage." Id. Instead of addressing the issue in their class certification briefing in LIBOR VII, moving defendants waited until now to move for dismissal of OTC plaintiffs' claims concerning transactions with defendants' subsidiaries or affiliates. Specifically, moving defendants now assert that OTC plaintiffs lack antitrust standing to bring claims that are based on: 1) instruments issued and sold only by Panel Banks' subsidiaries or affiliates; 2) instruments issued by Panel Banks' subsidiaries or affiliates but sold by Panel Banks; and 3) instruments issued by Panel Banks but sold by their affiliates or subsidiaries.

We grant moving defendants' motion as to the first two of these groups of claims. While we deny the motion as to the third

group of claims, those claims are circumscribed as set forth below. In considering the motion, we focus primarily on the first factor of the AGC test – directness of the asserted injury – because our analysis of the other three other factors would be substantially the same as it was in LIBOR VI.[99]

### 1. General Legal Standard for Judgment on Pleadings

A motion under Rule 12(c) is subject to the same standard that applies to a motion under Rule 12(b)(6). See Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006). Under that standard, a court "must accept as true the complaint's factual allegations and draw all inferences in favor of the non-movant. A complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. (citations and internal quotation marks omitted).

We must also generally confine ourselves to the four corners of the complaint and look only to the allegations contained therein. See, e.g., Williams v. City of New York, No. 10-cv-9594 (CM)(DCF), 2012 WL 547508, at *2 (S.D.N.Y. Feb. 17, 2012). "[W]hen matters outside the pleadings are presented in response to a 12(b)(6) motion," a district court must either "exclude the additional material and decide the motion on the complaint alone"

---

[99] We found that none of the other three AGC factors militated in favor of dismissing OTC plaintiffs' claims in LIBOR VI. See 2016 WL 7378980, at *17-20, *23.

or "convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material." Fonte v. Board of Managers of Continental Towers Condominium, 848 F.2d 24, 25 (2d Cir. 1988). This conversion requirement is strictly enforced. See Amaker v. Weiner, 179 F.3d 48, 50 (2d Cir. 1999).

## 2. Instruments Issued by Panel Bank Defendants' Subsidiaries/Affiliates

Moving defendants argue that OTC plaintiffs lack standing to bring claims based on instruments issued by Panel Banks' subsidiaries or affiliates[100] because there is no plausible allegation that the issuing entities "played a role in [the] alleged suppression of LIBOR." LIBOR VI, 2016 WL 7378980, at *10 (quoting Mem. & Order, 2016 WL 1733463, at *3 (S.D.N.Y. Apr. 29, 2016), ECF No. 1396). According to defendants, since the subsidiaries or affiliates did not participate in the alleged manipulation of LIBOR, their independent decisions to incorporate LIBOR into financial instruments break "the chain of causation between defendants' actions and a plaintiff's injury." Id. at *16. We agree.

---

[100] Based on defendants' definitions, these instruments could have been sold by: (1) the issuing entity; (2) another subsidiary or affiliate that is related to the issuing entity; or (3) the Panel Bank that is related to the issuing entity. See Mem. of Law in Supp. of Defs.' Mot. for Partial J. on Pleadings ("Defs.' OTC Br."), ECF No. 2621, at 2, 4.

OTC plaintiffs' attempt to rebut defendants' argument by conclusorily alleging that "every panel bank belonged to an integrated global enterprise that actively managed its interest rate risk, including LIBOR" is unavailing. OTC Pls.' Mem. of Law in Opp. to Defs.' Mot. for Judgment on Pleadings ("Pls.' OTC Br."), ECF No. 2669, at 3. They rely on annual reports published by Panel Banks' parent entities and argue that "the treasury or asset and liability management functions of the main bank" worked with different affiliated entities to "coordinate LIBOR submissions" and ensure that "customer-facing business segments did not sell (or even offer) financial instruments with interest rates above that of the bank's LIBOR submissions." Id. at 3-4. As these exhibits were neither attached to nor incorporated into plaintiffs' complaint, we need not consider them in deciding the instant motion.[101] In any event, the exhibits do not demonstrate that Panel Banks directed their subsidiaries or affiliates to use LIBOR in their issuance of financial instruments.

Plaintiffs try to overcome their pleading deficiencies by advancing the "single enterprise" theory adopted by the Supreme Court in Copperweld Corp. v. Independent Tube Corp., 467 U.S. 752 (1984). In Copperweld, the Supreme Court considered whether a wholly owned subsidiary is capable of conspiring with its parent

---

[101] OTC plaintiffs submitted more than 140 extrinsic exhibits in support of their opposition to moving defendants' motion. See ECF Nos. 2684, 2685, 2686.

company for purposes of violating § 1 of the Sherman Act. Since "[a] parent and its wholly owned subsidiary have a complete unity of interest," the Court held that "the <u>coordinated activity</u> of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise" <u>Id.</u> at 771 (emphasis added). Thus, the Court reasoned, a parent company and its wholly owned subsidiary "are incapable of conspiring with each other for purposes of § 1 of the Sherman Act."[102] <u>Id.</u> at 777.

The Ninth Circuit recently adopted a corollary of the "single enterprise" theory in <u>Arandell Corp. v. Centerpoint Energy Services, Inc.</u>, 900 F.3d 623 (9th Cir. 2018). In <u>Arandell</u>, the Ninth Circuit considered a case in which a natural gas company and other natural gas conglomerates conspired to fix retail natural gas prices. <u>Id.</u> at 628. The company's subsidiaries allegedly actively engaged in "coordinated price-fixing efforts" to further the company's price-fixing scheme. The court held that, since a parent company and its subsidiary "always have a 'unity of purpose' and act as a 'single entity' whenever they engage in 'coordinated activity,'" the subsidiaries were "deemed to have shared the intent of" their parent company because "it is legally impossible for firms with a single 'economic unit' to act together in furtherance

---

[102] Although <u>Copperweld</u> addressed the relationship between a parent company and its wholly owned subsidiary, "[l]ower courts have since applied <u>Copperweld</u>'s reasoning . . . to a broader variety of economic relationships." <u>Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.</u>, 407 F.3d 1027, 1034 (9th Cir. 2005).

of the same [conspiracy] for independent and distinct purposes."
Id. at 630-31; see also Lenox MacLaren Surgical Corp. v. Medtronic,
Inc., 847 F.3d 1221, 1236-39 (10th Cir. 2017).

Applying the rationale from Copperweld and Arandell, OTC
plaintiffs argue that they have standing to assert antitrust claims
against Panel Bank defendants because a Panel Bank and its
subsidiaries and affiliates are part of a "single enterprise" that
participated in the alleged conspiracy to manipulate LIBOR.  Pls.
OTC Br., at 7.  Panel Banks' subsidiaries and affiliates are
"guilty of selling price-fixed instruments to the OTC Class while
sharing their profits with the price-fixing panel bank," and since
a Panel Bank and its affiliated entities can be deemed to have
shared the anticompetitive intent, Panel Banks are "directly
responsible for price-fixed products sold by their subsidiaries
and affiliates."  See id.

What is missing from OTC plaintiffs' argument, however, is an
allegation of any "coordinated activity" between a Panel Bank and
its subsidiaries and affiliates.  Under Copperweld, only a
"coordinated activity" of related entities can be viewed as that
of a single enterprise.  See, e.g., Mitchael v. Intracorp, Inc.,
179 F.3d 847, 857 (10th Cir. 1999) (finding that the Supreme Court
held "only that 'the coordinated activity' of a parent and
subsidiary must be viewed as that of a single enterprise for § 1
purposes") (emphasis in original)).  This understanding is further

supported by the cases on which OTC plaintiffs themselves rely. See Arandell, 900 F.3d at 632 (holding that, based on plaintiffs' specific factual allegations[103] of "coordinated activity" between a parent company and its subsidiary, the subsidiary "had an anticompetitive purpose" that could give rise to antitrust liability "with or without an additional finding of knowledge" (citations omitted)); Lenox MacLaren, 847 F.3d at 1237 (holding that, in order to apply the "single enterprise" theory, a plaintiff must "come forward with evidence that each defendant independently participated in the enterprise's scheme, to justify holding that defendant liable as part of the enterprise").[104]

At oral argument, OTC plaintiffs argued that the sale of instruments by the subsidiaries and affiliates constitutes such "coordinated activity." Tr. 47:15 – 48:14. This argument might make sense if the conspiracy were based on profit motives. But as

---

[103] Plaintiffs alleged that each subsidiary entity "played a necessary role" in the price-fixing scheme by inflating "retail natural gas prices through manipulative trading," selling gas at inflated prices to its sister subsidiary entity, reselling the gas at inflated prices to other businesses, and "funnel[ing] the revenues from these sales" to the parent company. Arandell, 900 F.3d at 628. Plaintiffs also alleged that the parent company's officers and directors orchestrated the scheme, directing the subsidiaries "to manipulate retail prices" and "to send its illegal profits" to the parent company. Id.

[104] We recognize that the antitrust claims in Arandell and Lenox MacLaren were dismissed at the summary judgment stage. However, applying the legal standards applicable to a Rule 12(c) motion, we find here that OTC plaintiffs have not plausibly alleged any coordinated activity between Panel Bank defendants and their subsidiaries and affiliates. Furthermore, unlike most litigations at the motion to dismiss stage, OTC plaintiffs have received access to a considerable amount of discovery materials, including "disclosures previously made to governmental authorities." Jun. 17, 2016 Order, ECF No. 1461. Specifically, OTC counsel acknowledges that they reviewed "more than 1.5 million documents produced by the defendants and third parties" during the course of spending "over 52,000 hours prosecuting this case." OTC Pls. Mem. Law in Supp. of Mot. Atty. Fees, ECF No. 2705, at 14.

the Second Circuit held in <u>Schwab</u>, the pled conspiracy "had nothing to do with" the sale of LIBOR-based instruments.  883 F.3d at 87. The independent decision of Panel Banks' subsidiaries and affiliates to sell LIBOR-based financial instruments did not further the plausibly pled conspiracy, the main objective of which was achieved when Panel Banks submitted allegedly suppressed LIBOR submissions.[105]  Given that OTC plaintiffs' complaint does not contain any factual allegations that give rise to the inference that Panel Banks' subsidiaries and affiliates "independently participated in" the alleged manipulation of LIBOR manipulation, <u>Lenox MacLaren</u>, 847 F.3d at 1237, or actually "played a role in" the scheme, <u>LIBOR VI</u>, 2016 WL 7378980, at *10, we find that OTC plaintiffs lack antitrust standing to bring claims based on instruments issued by Panel Banks' subsidiaries or affiliates.

### 3. Instruments Issued by Panel Banks but Sold by Their Related or Unrelated Subsidiaries/Affiliates

Moving defendants assert that OTC plaintiffs are barred from asserting claims based on instruments issued by a Panel Bank but sold by its subsidiaries or affiliates under the "direct purchaser" rule of <u>Illinois Brick Co. v. Illinois</u>, 431 U.S. 720 (1977).

Under <u>Illinois Brick</u>, a "direct purchaser" is a plaintiff who purchased an allegedly price-fixed product directly from an alleged co-conspirator defendant.  <u>See</u> <u>id.</u> at 728-29.  The Supreme

---

[105] The universality of the use of LIBOR also undermines the significance of its use as evidence of "coordinated activity."

Court laid the groundwork for the "direct purchaser" rule in Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481 (1968), in which the defendant, a manufacturer of shoe-making machinery, was accused of driving up the price of the machinery. The defendant argued that the plaintiff, a shoe seller that leased the defendant's machines, had not suffered any injury from these inflated prices because the plaintiff had passed the overcharge on to its own customers by selling its shoes at higher prices. The Supreme Court "rejected as a matter of law this defense that indirect rather than direct purchasers were the parties injured by the antitrust violation." Illinois Brick, 431 U.S. at 724 (summarizing the holding in Hanover Shoe). The Court reasoned that adopting such a theory as a viable defense against an antitrust suit would force courts to consider a wide range of market-based factors that could potentially influence a company's pricing policies. Id. at 492-93.

While the defendants in Hanover Shoe fashioned this "pass-on" theory as a shield to defend against antitrust suits, the plaintiffs in Illinois Brick sought to use it as a sword, arguing that they had antitrust standing to sue concrete block manufacturers and distributers who allegedly conspired to fix the price of concrete block even though they had not purchased the block directly from the alleged price-fixers. See 431 U.S. at 726-27. The Court held that, since a defendant in an antitrust

lawsuit could not use the "pass-on" theory to claim that a direct purchaser suffered no loss or injury, an indirect-purchaser plaintiff could not use the same theory to claim damages for an overcharge that was allegedly passed on from the defendant, through intermediaries, to the plaintiff. Id. at 730. According to the Court, the "evidentiary complexities and uncertainties" discussed in Hanover Shoe would be multiplied if a plaintiff who is "several steps removed from the defendant in the chain of distribution" could claim an injury for an overcharge allegedly caused by that defendant. Id. at 732.

While the Court in Illinois Brick held that indirect purchasers generally do not have antitrust standing, it suggested in a footnote an exception to that rule whereby indirect purchasers who "owned or controlled" the direct purchaser may be permitted to sue. 431 U.S. at 736 n.16. This "ownership or control" exception "is now firmly established and has been expanded to include instances where the defendant owns or controls the intermediary that sold the goods to the indirect-purchaser plaintiff." In re Vitamin C Antitrust Litig., 279 F.R.D. 90, 101 (S.D.N.Y. 2012). Plaintiffs using this exception, however, "may not rely simply on the existence of a parent-subsidiary relationship," Vitamin C, 279 F.R.D. at 102; they must present facts that the relationship between the defendant and the intermediary "involve[s] such functional economic or other unity that there effectively has been

only one sale" between the defendant and the indirect purchaser. In re Microsoft Antitrust Litigation, 127 F. Supp. 2d 702, 713 (D. Md. 2001) (alterations omitted) (quoting Jewish Hosp. Ass'n v. Stewart Mech. Enters. Inc., 628 F.2d 971, 975 (6th Cir. 1980)); see also In re NASDAQ Mkt.-Makers Antitrust Litig., 169 F.R.D. 493, 505 (S.D.N.Y. 1996) ("[W]here a particular industry structure includes a principal-agent relationship between the indirect and direct purchasers such that the two are not distinct economic entities in the purchase chain, the indirect purchaser has antitrust standing under Illinois Brick.").

OTC plaintiffs assert that the "direct purchaser" rule is not (as defendants argue) dispositive here because the instruments that OTC plaintiffs purchased are not like the price-fixed goods at issue in Illinois Brick and Hanover Shoe, which raised concerns about "duplicative recovery by upstream and downstream purchases of the same price-fixed good."  Pls.' OTC Br., at 8.[106]  Rather, OTC plaintiffs purchased securities from which "no two OTC Class

---

[106] Defendants argue that the same double recovery issue may also exist in transactions in which OTC plaintiffs purchased and resold the instruments during the suppression period.  Reply Mem. of Law in Supp. of Defs.' Mot. for Partial Judgment on Pleadings, ECF No. 2703, at 5.  This argument fails for two reasons. First, a party that purchased an instrument from an OTC plaintiff would not have antitrust standing because the party would fail to meet the fourth factor of the AGC test.  See LIBOR VI, 2016 WL 7378980, at *23 (finding that, under the fourth factor, "courts are traditionally concerned with the prospect of different groups of plaintiffs attempting to recover for the same exact injury").  Second, a defensive use of the "pass-on" theory was rejected in Hanover Shoe and has no bearing on the determination of OTC plaintiffs' antitrust standing.  See 392 U.S. at 492-93.

members ever received the same suppressed interest payment."[107]
Id. Courts in this District recognize the distinction made by OTC
plaintiffs. For example, in cases addressing securities
transactions involving brokers, plaintiffs have advanced the
argument that, "as a matter of law, securities brokers are not
distinct economic entities; rather, as statutorily defined,
brokers buy or sell 'for the account of others,' not for their own
accounts." NASDAQ, 169 F.R.D. at 505 (quoting 15 U.S.C. § 78c).
The NASDAQ court held that the viability of this argument "turns
on the scope of the brokers' role in relation to the transaction
at issue." Id. If the brokers' purchase of a security is "itself
the ultimate service provided to the investor," then they "do not
constitute a distinct link in the chain of distribution" and
investors who transacted with the brokers were thus "direct
purchasers" with antitrust standing. Id. at 506.

In their complaint, OTC plaintiffs do not provide enough
information about their transactions to permit us to determine the
exact role that Panel Banks' subsidiaries and affiliates played.
However, based on this District's precedents, we find that
plaintiffs' antitrust standing extends only to claims based on

---

[107] OTC plaintiffs define the securities at issue to include "an interest rate swap or bond/floating rate note that includes any term, provision, obligation or right for the purchaser or counterparty to be paid interest by a Panel Bank (or a Panel Bank's subsidiaries or affiliates) based upon the 1 month or 3 month U.S. dollar LIBOR rate)." OTC Pls.' Compl., ECF No. 1857, ¶ 44.

purchases of Panel Bank-issued, LIBOR-based instruments[108] from Panel Banks' subsidiaries and affiliates that effectuated transactions "for the account of others." 15 U.S.C. § 78c. In other words, if the subsidiaries and affiliates played the role of a broker by simply "execut[ing] the purchases and sales requested by" OTC plaintiffs for panel bank issuances, then antitrust standing attaches. NASDAQ, 169 F.R.D. at 506.

## VI. Conclusion

The motions for leave to amend brought by Freddie Mac, Principal, the FDIC, and the NCUA are granted in part and denied in part. Lender plaintiffs' motion for leave to amend is denied. Moving plaintiffs are ordered to file their amended complaints in accordance with our rulings in this opinion by April 16, 2019.

Defendants' motion for partial dismissal of Schwab's and Doral's claims is granted in part and denied in part. As agreed upon by the FDIC and defendants, Doral's surviving claims will be incorporated into the amended complaint filed by the FDIC on behalf of the 38 other failed banks.

---

[108] Presumably, this ruling does not have any impact on the antitrust standing of OTC plaintiffs who purchased interest rate swaps from defendants, since swap agreements are "bespoke" contracts executed directly between two parties.

The motion for partial judgment on OTC plaintiffs' pleadings brought by Bank of America, N.A. and JPMorgan Chase Bank, N.A. is granted in part and denied in part.

This Memorandum and Order resolves the motions listed at docket entries 2544, 2546, 2551, 2552, 2562, 2563, 2620, and 2622.

**SO ORDERED.**

Dated: New York, New York
      March *25*, 2019

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

**APPENDIX**

This Memorandum and Order resolves the following docket entries in the following cases:

| CASE NAME | CASE NO. | ECF No. |
|---|---|---|
| In re Libor-Based Financial Instruments Antitrust Litigation | 11-md-2262 | 2544<br>2546<br>2551<br>2552<br>2562<br>2563<br>2620<br>2622 |
| Mayor & City Council of Baltimore v. Credit Suisse Group AG | 11-cv-5450 | 432 |
| Berkshire Bank v. Bank of America Corp. | 12-cv-5723 | 327 |
| Federal Home Loan Mortgage Corp. v. Bank of America Corp. | 13-cv-3952 | 293 |
| Principal Financial Group, Inc. v. Bank of America Corp. | 15-cv-9792 | 58 |
| Principal Funds, Inc. v. Bank of America Corp. | 15-cv-9793 | 52 |
| Charles Schwab Corp. v. Bank of America Corp. | 13-cv-7005 | 286 |
| National Credit Union Administration Board v. Credit Suisse Group AG | 13-cv-7394 | 244 |
| Federal Deposit Insurance Co. v. Bank of America Corp. | 14-cv-1757 | 251 |
| Federal Deposit Insurance Co. v. Bank of America, N.A. | 18-cv-1540 | 56 |